No. 23-55015

_____

In the
## United States Court of Appeals
### for the Ninth Circuit

_____

DANNY LOPEZ, INDIVIDUALLY, AND ON BEHALF OF ALL
OTHER AGGRIEVED EMPLOYEES,

*Plaintiff-Appellee,*

v.

AIRCRAFT SERVICE INTERNATIONAL, INC., ET AL.,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Central District of California, Case No. 2:21-cv-07108-DMG-E,
Hon. Dolly M. Gee, *United States District Judge*

_____

**BRIEF OF AIRLINES FOR AMERICA AS AMICUS CURIAE
IN SUPPORT OF APPELLANTS**

_____

Patricia N. Vercelli
Riva Parker
AIRLINES FOR AMERICA
1275 Pennsylvania Ave., NW
Washington, DC 20004

Shay Dvoretzky
  *Counsel of Record*
Kyser Blakely
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Amicus Curiae Airlines for America*

## DISCLOSURE STATEMENT

Airlines for America is a nonprofit corporation organized under the laws of the District of Columbia. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ..............................................................................i

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION ...............................................................................2

LEGAL BACKGROUND ....................................................................6

    1.    The Federal Arbitration Act broadly promotes arbitration. ................................................................6

    2.    *Circuit City* held that § 1 of the FAA is narrow, covering only contracts with transportation workers. ........................................................................8

    3.    *Saxon* held that § 1 covers only transportation workers that are directly involved in transporting goods or people across state or international borders. ........................................................................10

ARGUMENT ..................................................................................12

    A.    Section 1 does not cover a class of workers who merely pump fuel into airplanes. ..............................13

        1.    Pumping fuel into airplanes is not direct involvement in transporting goods or people across state or international borders. ............................14

        2.    The district court's ruling is wrong. ...................17

    B.    The district court's erroneous ruling creates significant consequences for the entire transportation industry. .................24

CONCLUSION ...............................................................................31

**TABLE OF CONTENTS**
(continued)

**Page**

CERTIFICATE OF COMPLIANCE ...................................................................32

CERTIFICATE OF SERVICE ................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Allied-Bruce Terminix Cos. v. Dobson,
513 U.S. 265 (1995).............................................................................6, 7

AT&T Mobility LLC v. Concepcion,
563 U.S. 333 (2011).................................................................................7

Atchison, Topeka & Santa Fe Railway v. Buell,
480 U.S. 557 (1987)...............................................................................20

Baltimore & Ohio Southwestern
Railroad v. Burtch,
263 U.S. 540 (1924) .............................................. 12, 16, 18, 26

Chicago & Eastern Illinois Railroad v.
Industrial Commission of Illinois,
284 U.S. 296 (1932)............................................ 4, 5, 15, 16, 23

Chicago, Burlington, & Quincy Railroad v. Harrington,
241 U.S. 177 (1916).................................................................................15

Circuit City Stores, Inc. v. Adams,
532 U.S. 105 (2001)..................................................... 2, 6, 7, 8, 9, 11,
.................................................................... 17, 19, 21, 25, 26, 28

Citizens Bank v. Alafabco, Inc.,
539 U.S. 52 (2003) (per curiam)........................................................17

Epic Systems Corp. v. Lewis,
138 S. Ct. 1612 (2018)...........................................................................6

Erie Railroad v. Collins,
253 U.S. 77 (1920)........................................................................ 16, 23

Erie Railroad v. Szary,
253 U.S. 86 (1920)....................................................................... 16, 23

Gulf Oil Corp. v. Copp Paving Co.,
419 U.S. 186 (1974)..................................................................... 11, 25

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Del Biaggio*,
  834 F.3d 1003 (9th Cir. 2016) .............................................................17

*In re Tristar Esperanza Properties, LLC*,
  782 F.3d 492 (9th Cir. 2015) ..............................................................17

*New Prime Inc. v. Oliveira*,
  139 S. Ct. 532 (2019) ............................................................... 9, 19, 28

*New York Central & Hudson*
*River Railroad v. Carr*,
  238 U.S. 260 (1915) ................................................................. 5, 20, 25

*Philadelphia, Baltimore & Washington*
*Railroad v. Smith*,
  250 U.S. 101 (1919) ...................................................................... 21, 22

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010) .................................................................................6

*Rittmann v. Amazon.com, Inc.*,
  971 F.3d 904 (9th Cir. 2020) .............................................................30

*Scherk v. Alberto-Culver Co.*,
  417 U.S. 506 (1974) ............................................................................21

*Shanks v. Delaware, Lackawanna*
*& Western Railroad*,
  239 U.S. 556 (1916) ............................................................................20

*Southwest Airlines Co. v. Saxon*,
  142 S. Ct. 1783 (2022) ................................................. 2, 3, 4, 5, 10, 11,
  ................................................................. 12, 13, 14, 15, 16, 17, 18,
  ................................................................. 21, 23, 24, 25, 26, 27, 28, 29

*United States v. American Building*
*Maintenance Industries*,
  422 U.S. 271 (1975) ...................................................................... 21, 22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Urie v. Thompson*,
    337 U.S. 163 (1949) ............................................................ 20

*Wirtz v. B. B. Saxon Co.*,
    365 F.2d 457 (5th Cir. 1966) ........................................ 5, 22, 23, 24

**STATUTES**

9 U.S.C. § 1 ..................................................... 2, 3, 4, 5, 6, 7, 8, 9,
    .................................................... 10, 12, 13, 18, 19, 21, 22,
    .................................................... 23, 24, 25, 26, 27, 28, 29, 30

9 U.S.C. § 2 ................................................................ 6, 7, 8, 17, 19

Federal Employers Liability Act,
    35 Stat. 65 (1908) ................................................... 19, 20

N.J. Stat. § 34:3A-6(d) ........................................................ 30

N.J. Stat. § 34:3A-7 ........................................................... 30

Or. Rev. Stat. § 480.330 ....................................................... 30

**RULE**

Fed. R. App. P. 29 ............................................................. 1

## INTEREST OF AMICUS CURIAE

Airlines for America (A4A) is the oldest and largest airline trade association in the United States. Its members include Alaska Airlines, American Airlines, Atlas Air, Delta Air Lines, FedEx, Hawaiian Airlines, JetBlue Airways, Southwest Airlines, United Airlines, and United Parcel Service. These members, taken together, employ more than 80% of the airline industry's 750,000 workers. A4A advocates on behalf of its members for stable, uniform, and predictable rules governing the airline industry.

A4A has an interest in this case because the ruling below implicates the enforceability of its members' arbitration agreements with several of their employees. The district court ruled that a class of workers who merely pump fuel into airplanes is engaged in interstate commerce. As a result, any worker belonging to such a class is not bound by an arbitration agreement under 9 U.S.C. § 1, which exempts only certain transportation workers from the Federal Arbitration Act. The ruling below is wrong and will significantly affect the entire transportation industry, especially airlines.

A4A submits this brief under Federal Rule of Appellate Procedure 29. All parties have consented to the filing of this brief. No party or a party's counsel authored this brief in whole or in part, or contributed money

intended to fund preparing or submitting this brief. No other person—other than A4A, its members, or its counsel—contributed money intended to fund preparing or submitting this brief.

## INTRODUCTION

The Federal Arbitration Act (FAA) requires holding parties who agree to arbitrate to their word. That broad mandate has a narrow exception, 9 U.S.C. § 1, which covers only certain classes of workers engaged in foreign or interstate transportation. *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119 (2001). In *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789-90 (2022), the Supreme Court held that § 1 covers only transportation workers that are actively engaged or directly involved in transporting goods or people across state or international lines. This case asks a narrow question: Does a class of workers who merely pump fuel into airplanes that will cross borders meet that "direct involvement in transportation" standard? The answer is no. Airline fuel pumpers, like all fuel pumpers, are *indirectly* involved in cross-border transportation and thus are not transportation workers exempt from the FAA under § 1. The district court's ruling to the contrary is wrong, contravenes Supreme Court precedent, and undermines the very reason Congress enacted the FAA. This Court should reverse.

\*     \*     \*

Section 1 exempts from the FAA only certain transportation workers: "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Airline fuel pumpers are not seamen or railroad employees, nor are they engaged in foreign or interstate commerce. The latter criterion is satisfied only when the class of workers is "actively 'engaged'" or "directly involved in transporting goods [or people] across state or international borders." *Saxon*, 142 S. Ct. at 1789-90 (citation omitted).

Airline fuel pumpers do not meet that standard. Unlike ramp supervisors who frequently load cargo directly on interstate airplanes (the class of workers *Saxon* analyzed), fuel pumpers do not handle *anything* airlines transport from one state to another. Indeed, the fuel they pump into airplanes is (for the most part) gone before the cross-border flight even ends. Additionally, fuel pumpers do not directly participate in the actual cross-border transportation of goods or people, unlike pilots and flight attendants. Fuel pumpers thus lack the "central feature of a transportation worker" — active engagement in the transportation of goods or people across borders through the channels of foreign or interstate commerce. *Id.* at 1790.

Supreme Court precedent mandates this outcome. The Supreme Court has held that employees who merely provide instrumentalities traveling interstate (like railcars) with products necessary for propulsion (like coal) are not engaged in interstate transportation because they lack a "close or direct relation to interstate transportation." *Chicago & E. Ill. R.R. v. Industrial Comm'n of Ill.*, 284 U.S. 296, 298-99 (1932) (citation omitted). This precedent confirms that fuel pumpers, at most, are indirectly involved in cross-border transportation, which does not suffice under *Saxon*.

The district court's contrary ruling is wrong and will create significant consequences for the entire transportation industry.

First, the district court relied on the wrong legal standard. It ruled that airline fuel pumpers are exempt from the FAA because they are "so closely related to interstate transportation as to be practically a part of it." ER 7. *Saxon* did not graft a "closely related to" standard onto § 1 of the FAA. Instead, the Court adopted a direct-connection standard: "any class of workers *directly* involved in transporting goods [or people] across state or international borders falls within § 1's exemption." *Saxon*, 142 S. Ct. at 1789 (emphasis added). The Court had good reason not to adopt the inapplicable "closely related to" standard. That broad and imprecise test comes from

Supreme Court decisions construing the Federal Employers' Liability Act, which, unlike § 1 of the FAA, is "so broad that it covers a vast field about which there can be no discussion." *New York Cent. & Hudson River R.R. v. Carr*, 238 U.S. 260, 262 (1915).

The district court also followed an inapposite out-of-circuit decision involving yet another statute, the Fair Labor Standards Act. *Wirtz v. B. B. Saxon Co.*, 365 F.2d 457, 461 (5th Cir. 1966), held that "employees who hauled airplane fuel to the planes were engaged in [interstate] commerce" because their activities were "so closely related to such commerce as to be … a part of it." *Wirtz* contradicts Supreme Court precedent holding that employees who merely provide cross-border instrumentalities with products necessary for propulsion are *not* engaged in interstate commerce. *Chicago & E. Ill. R.R.*, 284 U.S. at 298-99. *Wirtz* also relied on the inapplicable "closely related to" standard. And even assuming the "closely related to" standard applies to § 1 of the FAA, *Wirtz* applied that standard so loosely that its analysis is inconsistent with *Saxon*'s instruction that § 1 does not apply if the class of workers is "only 'perceptibly connected to' … interstate commerce." 142 S. Ct. at 1792 (citation omitted).

Lastly, in ruling that airline fuel pumpers are exempt from the FAA, the district court erroneously gave § 1 a broad scope, creating significant line-drawing problems and undermining the FAA's proarbitration purpose.

This Court should reverse the district court's ruling and hold that a class of workers who merely pump fuel into airplanes is not engaged in interstate commerce and thus is not covered by 9 U.S.C. § 1.

## LEGAL BACKGROUND

### 1. The Federal Arbitration Act broadly promotes arbitration.

The FAA promotes arbitration over litigation by honoring arbitration agreements just like other contracts. *Circuit City*, 532 U.S. at 123; *see* 9 U.S.C. § 2. Before the FAA, courts were hostile to arbitration agreements, refusing to enforce them despite their contractual nature. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995); *see Circuit City*, 532 U.S. at 111. The FAA ended that practice. It put "arbitration agreements on an equal footing with other contracts" and it "require[d] courts to enforce them according to their terms." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Now, courts must hold parties that agree to arbitrate to their word. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). The FAA thus reflects Congress' decision

to promote arbitration given its substantial benefits: "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011) (citation omitted).

The FAA's coverage is sweeping. Indeed, it is an "exercise [of] Congress' commerce power to the full." *Allied-Bruce*, 513 U.S. at 277. Section 2 provides that every arbitration agreement set forth in a "maritime transaction or a contract evidencing a transaction involving commerce … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. That expansive wording "compels judicial enforcement of a wide range of written arbitration agreements," including those found in employment contracts. *Circuit City*, 532 U.S. at 111, 113-14. Section 1, by contrast, is a narrow exception to § 2's broad coverage. It states that the FAA "shall [not] apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

**2.** *Circuit City* **held that § 1 of the FAA is narrow, covering only contracts with transportation workers.**

In *Circuit City*, the Supreme Court held that § 1 "exempts from the FAA only contracts of employment of transportation workers." 532 U.S. at 119. Unlike § 2, which extends broadly to all contracts "involving commerce," the Court reasoned, § 1 narrowly covers only workers "engaged in commerce"—a term of art with "limited reach." *Id.* at 115-16. The *ejusdem generis* canon also supported "a narrow construction." *Id.* at 118. Because § 1 specifically identifies "seamen" and "railroad employees," the rest of the exemption must be interpreted narrowly to reach only similar kinds of workers—transportation workers. *Id.* at 114-15.

The FAA's "purpose" confirmed the Court's narrow reading. *Id.* at 118. Although the phrase "engaged in commerce" may not "necessarily have a uniform meaning whenever used by Congress," *id.* (citation omitted), the statute's proarbitration focus confirmed that there is "no reason" to adopt "an expansive construction," *id.* at 119. For instance, a broad construction of the § 1 exemption would introduce "considerable complexity and uncertainty … into the enforceability of arbitration agreements." *Id.* at 123. It also would eliminate the "real benefits … of arbitration" in contexts where

those benefits "may be of particular importance," like "in employment litigation." *Id.* at 122-23. *Circuit City* thus declined to construe § 1 in a way that would "breed[] litigation from a statute that seeks to avoid it." *Id.* at 123 (citation omitted).

*Circuit City* also rejected an argument that Congress had acted irrationally by enacting a narrow exemption. The Court inferred that Congress might have wished not "to unsettle established or developing statutory dispute resolution schemes covering specific workers." *Id.* at 121. "It would be rational for Congress to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation." *Id.* In other words, Congress enacted § 1 not to free transportation workers from their arbitration agreements, but to favor the "alternative employment dispute resolution regimes" it had created (or would create) for certain transportation workers over "whatever arbitration procedures the parties' private contracts might happen to contemplate." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).

**3.** *Saxon* **held that § 1 covers only transportation workers that are directly involved in transporting goods or people across state or international borders.**

In *Saxon*, the Supreme Court held that ramp supervisors who frequently load and unload cargo on and off airplanes traveling in interstate or foreign commerce are exempt from the FAA under § 1, because they are "actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." 142 S. Ct. at 1790. *Saxon* involved only a discrete class of airline employees—ramp supervisors. But it set forth the analytical framework governing the scope of the § 1 exemption: courts must define "the relevant 'class of workers'" to which the plaintiff belongs and then "determine whether that class of workers is 'engaged in foreign or interstate commerce.'" *Id.* at 1788.

Defining the relevant "class of workers" is straightforward. The inquiry turns on "the actual work that the members of the class, as a whole, typically carry out," "not what [the employer] does generally." *Id.* Relatedly, the class must be limited to "a subset of workers" within an industry, because the § 1 exemption is limited and does not apply "on an industrywide basis." *Id.* at 1791.

Once the class of workers is defined, the question is whether that class is "directly involved in transporting goods [or people] across state or international borders." *Id.* at 1789. *Saxon* did not definitively define the contours of that standard, but it did provide three important guideposts. *First*, for a class of workers to be covered by § 1, it "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 1790 (citing *Circuit City*, 532 U.S. at 121). "Put another way, transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Id.* (citing *Circuit City*, 532 U.S. at 121). *Second*, the "direct involvement" or "direct connection" standard does not require the class to cross state or international lines. *See id.* at 1791-92. *Third*, the § 1 exemption does not apply if the class is "only 'perceptibly connected to' … interstate commerce," say by "making intrastate sales of asphalt" that would later be used to construct "interstate highways." *Id.* at 1792 (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194 (1974)).

While the Court in *Saxon* identified these guideposts, it had no occasion to meaningfully apply them because Supreme Court "case law makes clear," *id.*, that loading and unloading cargo on and off

instrumentalities traveling in interstate commerce "is so closely related to interstate transportation as to be practically a part of it," *id.* at 1789 (quoting *Baltimore & Ohio Sw. R.R. v. Burtch*, 263 U.S. 540, 544 (1924)). Notably, in following that precedent, *Saxon* did not graft the "closely related to" standard onto § 1 of the FAA. It instead adopted a direct-connection standard: "any class of workers *directly* involved in transporting goods [or people] across state or international borders falls within § 1's exemption." *Id.* at 1789 (emphasis added).

## ARGUMENT

This Court should reverse the district court's ruling and hold that § 1 of the FAA does not cover a class of workers who merely pump fuel into airplanes destined to cross state or international lines. All agree on the relevant class of workers: airline fuel pumpers. The only question is whether airline fuel pumpers are directly involved in transporting goods or people across borders. They are not. Fuel pumpers, at most, are indirectly involved in cross-border transportation, as Supreme Court precedent makes clear. The district court's contrary ruling is wrong. The district court relied on the wrong legal standard and followed an inapposite out-of-circuit decision. As a result, the district court erroneously gave § 1 a broad scope, creating

significant line-drawing problems and undermining the FAA's proarbitration purpose.

## A. Section 1 does not cover a class of workers who merely pump fuel into airplanes.

The transportation-worker exemption applies to "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Airline fuel pumpers are neither seamen nor railroad employees. They also are not engaged in foreign or interstate commerce. Under *Saxon*, that criterion is satisfied only when the class of workers is actively engaged or directly involved in transporting goods or people across state or international borders. Airline fuel pumpers do not meet that standard. They do not handle *anything* that airlines transport from one state to another, unlike cargo-loading ramp supervisors, and they do not participate *at all* in the actual interstate transportation of goods or people, unlike pilots and flight attendants. Fuel pumpers are thus indirectly involved in transporting goods or people across borders, which does not suffice under *Saxon*.

### 1. Pumping fuel into airplanes is not direct involvement in transporting goods or people across state or international borders.

**a.** There is a meaningful difference between loading cargo on an airplane bound for interstate travel, on the one hand, and merely pumping fuel into that airplane, on the other. The Supreme Court held that ramp supervisors are "actively 'engaged'" or "directly involved in transporting goods across state [lines]" because "they handle goods traveling … interstate." *Saxon*, 142 S. Ct. at 1789-90, 1792 (citation omitted). In other words, by "physically loading cargo directly on" an interstate instrumentality, ramp supervisors are "intimately involved with the commerce (*e.g.,* transportation) of that cargo" and thus, "as a practical matter, [are] part of [its] interstate transportation." *Id.* at 1789.

Fuel pumpers, by contrast, are only indirectly involved in transporting goods or people across state lines. They do not handle *anything* that airlines transport from one state to another. Indeed, the fuel they pump into airplanes is (for the most part) gone before the interstate flight even ends. Fuel pumpers also do not participate *at all* in the actual interstate transportation of goods or people, unlike pilots and flight attendants. Without these "direct" connections—to either the things being transported

or the act of transporting those things across state lines—fuel pumpers lack the "central feature of a transportation worker": "active[] 'engage[ment] in [the] transportation' of … goods [or people] across borders via the channels of foreign or interstate commerce." *Id.* at 1790 (citation omitted).

**b.** Supreme Court precedent confirms that fuel pumpers, at most, are indirectly involved in transporting goods or people across state or international borders. In *Chicago & Eastern Illinois Railroad*, the Court held that a railroad employee whose work involved making coal available for use in propelling interstate railcars was *not* engaged in interstate commerce. *See* 284 U.S. at 297-99. There, the employee injured his hand while oiling a motor that "furnished power for hoisting coal into a chute, to be taken therefrom by, and for the use of, locomotive engines principally employed in the movement of interstate freight." *Id.* at 297. Despite his duties of making coal available for use as fuel in interstate railcars, the Court held that the employee was not engaged in interstate commerce because he did not have a "close or direct relation to [the] interstate transportation." *Id.* at 299 (quoting *Chicago, Burlington, & Quincy R.R. v. Harrington*, 241 U.S. 177, 180 (1916)).

In reaching that decision, the Court overruled *Erie Railroad v. Collins*, 253 U.S. 77, 82-86 (1920), and *Erie Railroad v. Szary*, 253 U.S. 86, 89-90 (1920), which held that railroad workers who provide interstate instrumentalities with products that are necessary for propulsion *are* engaged in interstate commerce. *See Chicago & E. Ill. R.R.*, 284 U.S. at 299-300. In *Collins*, the employee was injured while operating an engine that "pump[ed] … water" into steam-operated locomotives traveling interstate. 253 U.S. at 82. And in *Szary*, the employee was injured after "sand[ing] about seven engines whose destinations were other States." 253 U.S. at 89. "Sand is necessary to an engine," *id.*, just like coal for railcars, water for steam-operated locomotives, and gasoline for airplanes.

Similar to how *Burtch* dictated the outcome in *Saxon*, *see* 142 S. Ct. at 1789, 1792, *Chicago & Eastern Illinois Railroad* dictates the outcome here: employees who merely provide interstate instrumentalities with products that are necessary for propulsion (*e.g.*, gasoline, coal, water, or sand) have "no … close or direct relation to interstate transportation." *Chicago & E. Ill. R.R.*, 284 U.S. at 299 (citation omitted). Said in *Saxon*'s terms, fuel pumpers are not "actively 'engaged'" or "directly involved in transporting goods [or

people] across state or international borders." 142 S. Ct. at 1789-90 (citation omitted).

**c.**     There is, to be sure, some sort of nexus between pumping fuel into airplanes and the interstate transportation of goods or people. But the § 1 exemption—particularly the phrase "engaged in commerce," which has a "limited reach," *Circuit City*, 532 U.S. at 115—does not include a "nexus" component. That's because nexus tests are "expansive," *In re Del Biaggio*, 834 F.3d 1003, 1009 (9th Cir. 2016), and "sweep[] broadly," *In re Tristar Esperanza Props., LLC*, 782 F.3d 492, 495 (9th Cir. 2015). Indeed, § 2 of the FAA requires only a "sufficient nexus" to commerce, *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 53 (2003) (per curiam), given its "expansive" wording, *Circuit City*, 532 U.S. at 113. Section 1, however, requires a more "direct" connection: "active[] 'engage[ment] in [the] transportation' of … goods [or people] across borders via the channels of foreign or interstate commerce." *Saxon*, 142 S. Ct. at 1790 (citation omitted). As explained, fuel pumpers do not meet that standard, legally or logically.

## 2.     The district court's ruling is wrong.

In holding that a class of workers who merely pump fuel into airplanes is engaged in interstate commerce and thus exempt from the FAA under

9 U.S.C. § 1, the district court relied on an incorrect legal standard and an inapposite out-of-circuit decision involving the Fair Labor Standards Act (FLSA).

**a.** The district court reasoned that fuel pumpers are "so closely related to interstate transportation as to be practically a part of it." ER 7. The court borrowed that language from *Saxon*. But as explained, *Saxon* did not graft the "closely related to" standard onto § 1 of the FAA. It instead adopted a direct-connection standard: "any class of workers *directly* involved in transporting goods [or people] across state or international borders falls within § 1's exemption." *Id.* at 1789 (emphasis added); *see supra* pp. 11-12.

The "closely related to" standard stems from Supreme Court decisions construing the Federal Employers' Liability Act (FELA). *See Burtch*, 263 U.S. at 544. *Saxon* relied on *Burtch* to make a discrete point: courts have long classified employees who load and unload cargo directly on and off interstate instrumentalities as being engaged in interstate commerce, and that established classification is "too plain to require [further] discussion." 142 S. Ct. at 1789 (quoting *Burtch*, 263 U.S. at 544). But again, *Saxon* did not hold that FELA's "closely related to" standard applies to § 1 of the FAA. The Court had good reason not to. Indeed, FELA's text and purpose and several

Supreme Court decisions show that FELA is a broad exercise of Congress' power, quite different from the narrow and limited text in § 1 of the FAA.

*i.* Start with FELA's text, which differs in important ways from the FAA's. When Congress enacted the FAA, FELA provided that "every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." 35 Stat. 65, 65, § 1 (1908). Section 1 of the FAA, in contrast, reached only "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Among the many textual differences: (1) FELA first focuses on the *employer's* business, while § 1 of the FAA targets the *employee's* work only; (2) FELA refers to employees in their individual capacity ("any person"), while the FAA addresses any "class of workers"; (3) FELA neither enumerates workers, like seamen and railroad employees, nor includes a residual clause; and (4) FELA's language *extends* broad coverage, like FAA § 2, while FAA § 1 *narrows* broad coverage.

These textual disparities reflect differences in purpose and scope. While § 1 of the FAA is a "narrow," *Circuit City*, 532 U.S. at 118, and "very particular" carveout from § 2's expansive scope, *New Prime*, 139 S. Ct. at 537,

"FELA is a broad remedial statute," *Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557, 562 (1987). Congress liberally gave railroad workers injured on the job a cause of action against their employers, using "broad language" to define the statute's "coverage." *Id.* at 561; *see also* 35 Stat. at 65-66, §§ 1, 5. And given FELA's "remedial and humanitarian purpose," *Urie v. Thompson*, 337 U.S. 163, 181 (1949), the Supreme Court interpreted the statute "even more broadly." *Buell*, 480 U.S. at 562. "The scope of [FELA] is so broad that it covers a vast field about which there can be no discussion." *Carr*, 238 U.S. at 262.

The Supreme Court fashioned the "closely related to" standard after FELA's expansive scope. It read FELA to reach employees whose activities were "so closely related" to interstate commerce "as to be practically a part of it." *Shanks v. Delaware, Lackawanna & W. R.R.*, 239 U.S. 556, 558 (1916). That interpretation "[spoke] of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion." *Id.* In other words, the adoption of the "closely related to" standard was driven less by the statute's text and more by what the Court viewed as "the evident purpose of Congress," *id.*—broad coverage, *Carr*, 238 U.S. at 262.

*ii.* FELA is nothing like § 1 of the FAA. Besides the many textual differences, *supra* p. 19, Congress enacted the statutes for different reasons. While FELA created claims for individuals injured on the job, the FAA "revers[ed] centuries of judicial hostility to arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510 (1974). And while Congress designed FELA to sweep broadly, similar to § 2 of the FAA, Congress gave § 1 of the FAA "a more limited reach." *Circuit City*, 532 U.S. at 115.

Caselaw confirms that the atextual "closely related to" standard does not apply to § 1 of the FAA. For example, in *Philadelphia, Baltimore & Washington Railroad v. Smith*, 250 U.S. 101, 102-04 (1919), the Supreme Court held that a "mess cook" for "a gang of bridge carpenters" "was engaged in interstate commerce within the meaning of [FELA]," because he "was assisting" their work "by keeping their bed and board" and "cooking" their meals. The Court recognized that the mess cook's connection to interstate commerce was "remote," but it still held that the "closely related to" standard was met. *Id.* at 103.

*Smith* cannot be squared with the decisions that *Saxon* said involved conduct "only 'perceptibly connected to' … interstate commerce." 142 S. Ct. at 1792. In *United States v. American Building Maintenance Industries*, 422 U.S.

271, 283 (1975), for instance, the Court held that companies supplying janitorial services were not "engaged in interstate commerce" even though they served "enterprises which were themselves clearly engaged in" such commerce. If providing janitorial services to persons engaged in interstate commerce does not satisfy *Saxon*'s direct-involvement standard, then neither does cooking and cleaning for persons engaged in interstate commerce. *Contra Smith*, 250 U.S. at 103.

In sum, given the differences between § 1 of the FAA and FELA, the district court erred in applying the "closely related to" standard.

**b.** The district court also erred in following *Wirtz*, an inapposite Fifth Circuit decision involving the FLSA. *See* ER 7. *Wirtz* decided whether certain workers employed at two Air Force bases were engaged in interstate commerce and thus protected by the FLSA. 365 F.2d at 459. One group of workers "transported fuel from bulk storage tanks to the airplanes, where the fuel was put into the planes by Air Force personnel." *Id.* "There can be no question," *Wirtz* held, "that the employees who hauled airplane fuel to the planes were engaged in [interstate] commerce," because their activities were "so closely related to such commerce as to be … a part of it." *Id.* at 461. *Wirtz* is inapplicable for at least three reasons.

*First*, *Wirtz* is inconsistent with *Chicago & Eastern Illinois Railroad*, where the Supreme Court overruled *Collins* and *Szary* and held that employees who provide interstate instrumentalities with products necessary for propulsion (like gasoline) have "no … close or direct relation to interstate transportation" and thus are not engaged in interstate commerce. *Chicago & E. Ill. R.R.*, 284 U.S. at 298-99. This alone mandates reversal.

*Second*, *Wirtz* applied FELA's "closely related to" standard, *see* 365 F.2d at 461, rather than *Saxon*'s direct-involvement standard, *see* 142 S. Ct. at 1789. As explained, the "closely related to" standard does not apply to § 1 of the FAA. *Supra* pp. 18-22. (Whether *Wirtz* properly applied the "closely related to" standard to the FLSA does not matter for deciding this case.) True, *Chicago & Eastern Illinois Railroad* applied the "closely related to" standard. *See* 284 U.S. at 298-99. But again, the Supreme Court there held that workers providing fuel to interstate instrumentalities are not engaged in interstate commerce. *Id.* So even if this Court were to consult the inapplicable "closely related to" standard, the district court's decision is still wrong.

*Third*, setting the "closely related to" standard to the side, *Wirtz* is inconsistent with *Saxon*'s instruction that the § 1 exemption does not apply if the class of workers is "only 'perceptibly connected to' … interstate

commerce." 142 S. Ct. at 1792 (citation omitted). *Wirtz* held that "employees engaged in maintaining" "runways, taxiways, and warm-up pads, and the like" are engaged in interstate commerce. 365 F.2d at 462. But that conduct is no more directly involved in interstate commerce than "making intrastate sales of asphalt" that would later be used to build "interstate highways," or "supplying localized janitorial services to a corporation engaged in interstate commerce." *Saxon*, 142 S. Ct. at 1792 (alteration adopted; citation omitted). The fact is, all three are only perceptibly connected to interstate commerce, which does not suffice. This shows that *Wirtz*'s entire analysis is at odds with *Saxon*.

*       *       *

The district court justified its ruling on two grounds: the "closely related to" standard and *Wirtz*. Both grounds fail. Its decision should be reversed.

### B.    The district court's erroneous ruling creates significant consequences for the entire transportation industry.

The district court's ruling gives § 1 a broad scope, creating significant line-drawing problems and undermining the very purpose of the FAA.

These issues will significantly affect the entire transportation industry, and airlines in particular.

1. By relying on the "closely related to" standard, the district court necessarily gave § 1 of the FAA a scope like FELA: a scope "so broad that it covers a vast field about which there can be no discussion." *Carr*, 238 U.S. at 262. The district court's ruling thus has the potential to expand § 1—which has a "limited reach," *Circuit City*, 532 U.S. at 115—to cover several classes of workers that are not directly involved in transporting goods or people across state or international borders. *Contra Saxon*, 142 S. Ct. at 1789. What's more, because nexus tests are "broad" and have "no logical endpoint," *Gulf Oil*, 419 U.S. at 198, the district court's ruling will create significant line-drawing problems for the entire transportation industry. This flaw is readily apparent when considering some of the many types of workers that airlines employ.

Customer assistance agents, for example, typically work with passengers before the security checkpoint. They check in passengers' baggage at kiosks, review passengers' documents, and accept passengers' self-tagged baggage. Customer assistance agents presumably are not "directly involved" in transporting goods across state lines given that they

do not physically load cargo directly on interstate airplanes. *Saxon*, 142 S. Ct. at 1789. Therefore, like fuel pumpers and unlike cargo-loading ramp supervisors, customer service agents lack the "central feature of a transportation worker": "active[] 'engage[ment] in [the] transportation' of … goods [or people] across borders via the channels of foreign or interstate commerce." *Id.* at 1790 (citing *Circuit City*, 532 U.S. at 121). That analysis is clear and straightforward. But under the broad and imprecise "closely related to" standard, courts will have difficultly deciding whether customer assistance agents are "so closely related to interstate transportation as to be practically a part of it." *Burch*, 263 U.S. at 544. And because that "know it when you see it" test is difficult to apply, courts will also struggle to justify whatever line they happen to draw.

Gate agents present a similar problem. Gate agents typically work with passengers after the security checkpoint. They print and scan boarding passes, and they help passengers find alternative flights, among other things. Simply printing and scanning boarding passes and rebooking missed flights presumably does not constitute active engagement in the transportation of goods or people across borders. But under the "closely related to" standard, the answer is unclear. Are gate agents "engaged in

foreign or interstate commerce," 9 U.S.C. § 1, simply because they physically are closer to the airplane than customer assistance agents, even though neither are directly involved in the actual transportation?

The list of airline workers, and the resulting line-drawing problems, go on. Ground operations crewmembers operate ground-based vehicles, coordinate aircraft service, help prepare aircraft cabins for departure, and assist with ramp-service duties, including waste disposal. Aircraft maintenance technicians service airplanes, doing everything from preventive maintenance and inspections to replacing and repairing parts. Ground service equipment technicians troubleshoot, repair, and perform preventive maintenance on ground service equipment. Fleet service agents receive, weigh, document, and deliver cargo to and from warehouses and loading docks and transport items between terminals and aircraft. And facility maintenance technicians maintain airlines' buildings and troubleshoot electrical issues.

The "closely related to" standard does not provide clear and consistent answers for any of these classes of workers. But under *Saxon*'s direct-involvement standard, none of these classes of workers are actively engaged

in transporting goods or people across borders, so none are exempt from the FAA under § 1.

**2.** The district court's decision also undermines the FAA's proarbitration purpose. *Supra* pp. 6-9. The whole point of the FAA is to honor arbitration agreements and "avoid" litigation. *Circuit City,* 532 U.S. at 123 (citation omitted). By enacting § 1—a "narrow," *id.* at 118, and "very particular qualification," *New Prime*, 139 S. Ct. at 537—Congress did not intend to preserve some portion of the "judicial hostility to arbitration agreements" that had predated the FAA. *Circuit City*, 532 U.S. at 118 (citation omitted). Instead, "it seems Congress" simply sought to favor the "alternative employment dispute resolution regimes" it had created (or would create) for certain transportation workers over "whatever arbitration procedures the parties' private contracts might happen to contemplate." *New Prime*, 139 S. Ct. at 537. Put simply, Congress did not intend to create a large gap in coverage leaving countless workers subject to neither a federal dispute-resolution regime nor the FAA.

The district court's erroneous ruling threatens such a gap. The "closely related to" standard is broader than *Saxon*'s direct-involvement standard, meaning more classes of workers will be exempt from the FAA under the

district court's ruling than they would be under Supreme Court precedent. And assuming those classes of workers are not subject to a federal dispute-resolution regime (like the Railway Labor Act, which applies to *unionized* airline employees), the gap in coverage, and thus the amount of litigation, will be far greater than either Congress or the Supreme Court could have imagined.

     **3.**     The district court's erroneous ruling is not limited to the airline industry. For one thing, the "closely related to" standard is just as difficult to apply to the airline industry as it is to the gig economy. *Cf. Saxon*, 142 S. Ct. at 1789 n.2 (recognizing the difficulty of determining whether § 1 applies to workers employed in the gig economy). For another thing, there is no principled way to limit the district court's ruling to just airline fuel pumpers.

     According to the district court, "the act of fueling cargo planes that carry goods in interstate commerce is 'so closely related to interstate transportation as to be practically a part of it.'" ER 7. The logic underpinning that ruling is simple: "physically adding fuel" to an instrumentality engaged in interstate commerce is enough to trigger § 1 of the FAA. *Id.* That logic can apply to *any* class of fuel pumpers no matter the instrumentality, whether it be an airplane or a truck. So, under the district court's logic, some gas

stations attendants would qualify as transportation workers and thus be covered by § 1. That is especially true in states like Oregon and New Jersey, where state law generally prohibits drivers from pumping their own gas. *See* Or. Rev. Stat. § 480.330; N.J. Stat. §§ 34:3A-6(d), 34:3A-7. And in this Circuit, where so-called "last leg" delivery drivers are covered by § 1 "even if they do not cross state lines to make their deliveries," *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 919 (9th Cir. 2020), gas station attendants may be able to escape arbitration even if the vehicles they service never cross state lines. None of that makes any sense.

## CONCLUSION

The Court should reverse the district court's ruling and hold that a class of workers who merely pump fuel into airplanes is not engaged in interstate commerce and thus is not covered by 9 U.S.C. § 1.

Dated: April 17, 2023

Respectfully submitted,

*/s/ Shay Dvoretzky*

Patricia N. Vercelli
Riva Parker
AIRLINES FOR AMERICA
1275 Pennsylvania Ave., NW
Washington, DC 20004

Shay Dvoretzky
  *Counsel of Record*
Kyser Blakely
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Amicus Curiae Airlines for America*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 23-55015

I am the attorney or self-represented party.

**This brief contains** | 6,071 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Shay Dvoretzky | **Date** | 04/17/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 17, 2023          Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Amicus Curiae*
 *Airlines for America*

- 33 -