Case No. 23-55015

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

DANNY LOPEZ, individually, and on behalf of all other aggrieved employees,

*Plaintiff-Appellee,*

*v.*

AIRCRAFT SERVICE INTERNATIONAL, INC., a corporation and MENZIES AVIATION (USA), INC., a corporation

*Defendants-Appellants.*

On Appeal from the United States District Court for the Central District of California in No. 2:21-cv-07108-DMG-E
The Honorable Dolly M. Gee

---

## PLAINTIFF AND APPELLEE DANNY LOPEZ'S
## ANSWERING BRIEF

---

Matthew J. Matern (Cal. State Bar No. 159798)
Matthew W. Gordon (Cal. State Bar No. 267971)
Max N. Sloves (Cal. State Bar No. 217676)
Kiran Prasad (Cal. State Bar No. 255348)
**MATERN LAW GROUP, PC**
1230 Rosecrans Avenue, Suite 200
Manhattan Beach, California 90266
Telephone: (310) 531-1900
Facsimile: (310) 531-1901

*Attorneys for Plaintiff and Appellee*
DANNY LOPEZ

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................. IV

INTRODUCTION ........................................................................... 1

ISSUES PRESENTED ....................................................................... 5

STATEMENT OF THE CASE ............................................................ 5

    A.    ASI Moved to Compel Arbitration of Lopez's PAGA Claim. ............ 6

    B.    Lopez Opposed ASI's Motion to Compel on Multiple Grounds......... 8

    C.    The District Court Denied ASI's Motion to Compel Arbitration. ....... 9

SUMMARY OF ARGUMENT ........................................................... 11

STANDARD OF REVIEW ............................................................... 13

ARGUMENT.................................................................................. 13

I.    The District Court Correctly Determined that Lopez Belonged to a
Class of Workers "Engaged in Interstate Commerce" Under Saxon............13

    A.    Lopez's Work is "So Closely Related to Interstate Transportation
as to Be Practically a Part of It." .......................................................17

    B.    Lopez Played a Direct and Necessary Role in the Interstate
Transportation of Goods. ..................................................................22

# TABLE OF CONTENTS (Cont'd)

**Page(s)**

    C.    Saxon Did Not Establish, and Lopez is Not Required to Satisfy, a "Hands-on" Requirement. ............................................................23

II.    Binding Ninth Circuit Case Law Also Confirms that Airline Fuelers are "Engaged in Interstate Commerce" as the Term was Historically Understood. ................................................................................26

III.    The District Court's Conclusion that Lopez was Exempt under Section 1 is Supported by Nearly a Century of Case Law about Railroad "Firemen" and Fuelers. ................................................36

IV.    The FAA's Legislative History Supports Exempting Interstate-Vehicle Fuelers under Section 1 ................................................................50

V.    The "Closely Related To" Standard is a Workable Standard for Identifying Employees Engaged in Interstate Commerce. ..........................52

CONCLUSION ................................................................54

STATEMENT OF RELATED CASES ................................................56

CERTIFICATE OF COMPLIANCE.....................................................56

CERTIFICATE OF SERVICE.........................................................58

iii

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

*Anderson v. Baltimore & O.R. Co.*,
   96 F.2d 796 (2d Cir. 1938) ................................................................. 37

*Armstrong v. Michaels Stores, Inc.*,
   59 F.4th 1011 (9th Cir. 2023) ........................................................... 36

*Asplundh Tree Expert Co. v. Bates*,
   71 F.3d 592 (6th Cir. 1995) .............................................................. 20

*Atlantic Coast Line R. Co. v. Williams*,
   284 F. 262 (5th Cir. 1922) ................................................................ 37

*Balen v. Holland America Line Inc.*,
   583 F.3d 647 (9th Cir. 2009) ............................................................ 13

*Baltimore & Ohio Sw. R. Co. v. Burch*,
   263 U.S. 540 (1924) ......................................................................... 15

*Canlas v. Aircraft Serv. Int'l, Inc.*,
   2017 WL 11715182 (N.D. Cal. Aug. 31, 2017) ................................. 43

*Carmona v. Domino's Pizza, LLC*,
   73 F.4th 1135 (9th Cir. 2023) ................................................ 12, 26, 54

*Chicago & E.I.R. Co. v. Industrial Commission of Illinois*,
   284 U.S. 296 (1932) ...................................................................... 43-44

*Chicago & N.W. Ry. Co. v. Bolle*,
   284 U.S. 74 (1931) ........................................................................... 46

*Chicago, Burlington & Q.R. Co. v. Harrington*,
   241 U.S. 177 (1916) ......................................................................... 45

iv

## TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

**Federal Cases (Cont'd)**

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)..............................................................11, 51, 52

*Cole v. Burns Int'l Sec. Servs.*,
    105 F.3d 1465 (D.C. Cir. 1997)...............................................12, 20, 29

*Columbia & P. S. R. Co. v. Sauter*,
    223 F. 604 (9th Cir. 1915) ................................................................ 25

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 ................................................................................... 23

*Dickstein v. duPont*,
    443 F.2d 783 (1st Cir. 1971) ............................................................. 20

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ........................................................................ 13

*Erie R. Co. v. Collins*,
    253 U.S. 77 (1920) .......................................................................... 45

*Erie R. Co. v. Purucker*
    244 U.S. 320 (1917)......................................................................... 24

*Erie R. Co. v. Szary*,
    253 U.S. 86 (1920)........................................................................... 45

*Erving v. Virginia Squires Basketball Club*,
    468 F.2d 1064 (2d Cir. 1972) ........................................................... 20

*Fraga v. Premium Retail Servs., Inc.*,
    61 F.4th 228 (1st Cir. 2023) .....................................................4, 21, 53

v

## TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

**Federal Cases (Cont'd)**

*Gabay v. Roadway Movers, Inc.,*
2023 WL 3144310 (S.D.N.Y. 2023)....................................................... 25

*Glover v. Union Pac. R. Co.,*
21 F. Supp. 618 (D. Idaho 1937) ......................................................... 24

*Great Northern Ry. Co. v. U.S.,*
211 F. 309 (9th Cir. 1914).............................................................19, 36

*Gulf Oil Corp. v. Copp Paving Co.,*
419 U.S. 186 (1974)......................................................................16, 31

*Hill v. Rent-A-Center, Inc.,*
398 F.3d 1286 (11th Cir. 2005) .......................................................... 34

*Holley-Gallegly v. TA Operating LLC,*
2022 WL 9959778 (C.D. Cal. Sept. 16, 2022).........................9, 48, 49

*Immediato v. Postmates, Inc.,*
54 F.4th 67 (1st Cir. 2022) .............................................4, 21, 25, 53

*Lamphere v. Oregon R. & Nav. Co.,*
196 F. 336 (9th Cir. 1912) ................................................................. 38

*Lenz v. Yellow Transp., Inc.,*
431 F.3d 348 (8th Cir. 2005)......................................................33, 34, 39

*Louisville & N.R. Co. v. Parker,*
242 U.S. 13 (1916)............................................................................. 37

*McLeod v. Threlkeld,*
319 U.S. 491 (1943)......................................................................47, 48

# TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

## Federal Cases (Cont'd)

*Mitchell v. Empire Gas Engineering Co.*,
  256 F.2d 781 (5th Cir. 1958) .............................................................. 41

*Mitchell v. Lublin, McGaughy & Assocs.*,
  358 U.S. 207 (1959) ....................................................................... 41

*New Prime Inc. v. Oliveira*,
  139 S.Ct. 532 (2019) ........................................... 11, 14, 16, 27, 35, 51

*New York, N.H. & H.R. Co. v. Bezue*,
  284 U.S. 415 (1932) .....................................................................48, 49

*New York Cent. R. Co. v. Marcone*,
  281 U.S. 34 (1930) ......................................................................... 49

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ............................................................ 13

*Norfolk & W. R. Co. v. Earnest*,
  229 U. S. 114 (1913), ..................................................................... 19

*North Carolina R. Co. v. Zachary*,
  232 U. S. 248 (1914), .................................................................19, 36, 37

*Overstreet v. N. Shore Corp.*,
  318 U.S. 125 (1943) ....................................................................... 23

*Pa. R. Co. v. Hammond*,
  7 F.2d 1010 (2d Cir. 1925) ................................................................ 38

*Pa. R. Co. v. U.S. R.R. Lab. Bd.*,
  261 U.S. 72 (1923) ......................................................................... 39

## TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

**Federal Cases (Cont'd)**

*Palcko v. Airborne Express, Inc.*,
  372 F.3d 588 (3d Cir. 2004) ..........................................................12, 25

*Pecos & N.T.R. Co. v. Rosenbloom*,
  240 U.S. 439 (1916) ...................................................................... 24

*Philadelphia, B. & W.R.R. Co. v. Smith*,
  250 U.S. 101 (1919) ...................................................................... 47

*Phillips v. Pa. R. Co.*,
  283 F. 381 (7th Cir. 1922) ............................................................ 38

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395, (1967) ..................................................................... 35

*Pryner v. Tractor Supply Co.*,
  109 F.3d ..................................................................................... 55

*Reading Co. v. Geary*,
  47 F.2d 142 (4th Cir. 1931) ..........................................................19, 36

*Rittmann v. Amazon.com, Inc.*,
  971 F.3d 904 (9th Cir. 2020) .................. 1, 9, 12, 13, 26-28, 30, 32-34, 46, 53, 54

*S. Ry. Co. v. Puckett*,
  244 U.S. 571 (1917) .....................................................................24, 25

*San Pedro, L.A. & S.L.R. Co. v. Davide*,
  210 F. 870 (9th Cir. 1914) ............................................................ 24

*San Pedro, L.A. & S.L.R. Co. v. U.S.*,
  213 F. 326 (8th Cir. 1914) ............................................................19, 36

# TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

## Federal Cases (Cont'd)

*Sandifer v. U.S. Steel Corp.*,
  571 U.S. 220 (2014) .......................................................................... 16

*Seaboard Air Line Ry. v. Moore*,
  228 U.S. 433 (1913) .......................................................................... 25

*Shanks v. Delaware, Lackawanna & Western Railroad Co.*,
  239 U.S. 556 (1916) .....................................................................18, 19

*Singh v. Uber Techs., Inc.*,
  67 F.4th 550 (3d Cir. 2023) ......................................................3, 20, 25, 53

*Smith v. City of Jackson*,
  544 U.S. 228 (2005) ......................................................................30, 47

*Southwest Airlines Co. v. Saxon*,
  142 S.Ct. 1783 (2022) ............................... 1-3, 9, 10, 12-30, 32, 33, 40, 43, 46, 53

*Spokane, P. & S. Ry. Co. v. Martin*,
  80 F.2d 322 (9th Cir. 1935) ................................................................ 49

*St. Joseph & G.I. Ry. Co. v. United States*,
  232 F. 349 (8th Cir. 1916) ................................................................. 37

*Stover v. Experian Holdings, Inc.*,
  978 F.3d 1082 (9th Cir. 2020) ............................................................. 13

*Tenney Engineering, Inc. v. United Elec., Radio & Machine Workers of Am.*,
  207 F.2d 450 (3d. Cir. 1953) ............................................................20, 32

*Texas & P. Ry. Co. v. Rigsby*,
  241 U.S. 33 (1916) .......................................................................... 24

# TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

**Federal Cases (Cont'd)**

*United States v. Am. Bldg. Maintenance Indus.*,
422 U.S. 271 (1975) ................................................................15, 16, 31

*United States v. Yellow Cab Co.*,
332 U.S. 218 (1947) ........................................................................ 23

*Usery v. Yates*,
565 F.2d 93 (6th Cir. 1977) ............................................................ 23

*Veliz v. Cintas Corp., No. C*,
2004 WL 2452851 (N.D. Cal. Apr. 5, 2004) .................................... 39

*Viking River Cruises, Inc. v. Moriana*,
142 S.Ct. 1906 (2022) ................................................................ 6, 10

*Waithaka v. Amazon.com, Inc.*,
404 F. Supp. 3d 335 (D. Mass. 2019) .............................................. 38

*Waithaka v. Amazon.com, Inc*,
966 F.3d (2020) ...................................................................25, 29, 30, 38

*Wallace v. Grubhub Holdings, Inc.*,
970 F.3d 798 (7th Cir. 2020) .......................................................... 53

*Western & Atlantic R. R. v. Hughes*,
278 U.S. 496 (1929) ........................................................................ 37

*Wirtz v. B. B. Saxon Co.*,
365 F.2d 457 (5th Cir. 1966) .............................................. 10, 40-42

**Federal Statutes**

9 U.S.C. §2 ........................................................................................ 8

x

## TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

**Federal Statutes (Cont'd)**

9 U.S.C. § 1 ........................................................................1, 8, 11, 54

28 U.S.C. § 1332.................................................................... 6

28 U.S.C. § 1441.................................................................... 6

28 U.S.C. § 1446.................................................................... 6

45 U.S.C. § 151 ..................................................................... 6

45 U.S.C. § 181–188.............................................................. 51

46 U.S.C. § 651 ..................................................................... 51

**State Statutes**

California Labor Code § 2698................................................. 6

Plaintiff-appellee Danny Lopez ("Lopez") respectfully submits this Answering Brief in support of the district court's order denying defendants-appellants Aircraft Service International, Inc.'s and Menzies Aviation (USA), Inc.'s (collectively "ASI's") motion to compel arbitration.

## INTRODUCTION

Section 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, exempts from the FAA's coverage all "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Because plaintiff Danny Lopez, whose job was to fuel airplanes at Los Angeles International Airport, belonged to a class of workers engaged in foreign or interstate commerce within the meaning of FAA § 1, his employment agreements with ASI were exempt from the FAA's coverage and the district court was correct to deny ASI's motion to compel arbitration of his California state law claims.

The district court properly applied the analytical framework set forth in *Southwest Airlines Co. v. Saxon*, 142 S.Ct. 1783 (2022), and *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), in concluding that aircraft fuelers are a "class of workers engaged in foreign or interstate commerce" within the meaning of the FAA § 1 exemption, because they are "directly involved in . . . transportation itself" and because the work they perform is "so closely related to

interstate transportation as to be practically a part of it." 1-ER-7 (quoting *Saxon*, 142 S.Ct. at 1789).

Defendant-appellant ASI principally contends that FAA § 1 only exempts workers whose jobs require them to have "'hands-on' contact with the 'cargo' and 'goods'" traveling in interstate commerce. AOB 22-27; *see* 1-ER-11. That has never been the law, and the Supreme Court in *Saxon* expressly declined to decide whether it should be. *Saxon*, 142 S.Ct. at 1789 n.1 (the Court "need not consider ... whether supervision of cargo loading alone [without handling goods] would suffice" to exempt a class of workers under § 1). The Supreme Court's inquiry in *Saxon* focused on what constitutes a "class of workers" under FAA §1 and whether that exemption is limited to classes of workers whose jobs required them to *personally travel* across state lines. The Supreme Court unanimously held that Section 1 did not impose such a personal-travel requirement. *Id.* at 1789, 1791-92. Moreover, a century's worth of precedent establishes that workers who neither personally travel interstate nor have "hands-on" contact with goods or cargo that are transported interstate—such as drivers transporting travelers between train depots, and truck fuelers—may be exempt under FAA § 1 because their duties are sufficiently related to "interstate commerce" as that term was understood in 1925 when Congress enacted the FAA.

2

ASI also contends that employees who do not handle goods or cargo cannot be exempt under FAA § 1 even if their duties directly enable the interstate movement of an instrumentality of transportation (i.e., a train or aircraft) that carries goods or cargo interstate. That argument is contradicted by well-established Supreme Court and Ninth Circuit precedent establishing that workers whose duties are directly responsible, and essential, for enabling an instrumentality's interstate movement are engaged in interstate commerce—e.g., railroad section hands responsible for maintaining railroad tracks, train brakemen, firemen (or train fuelers), switchmen and switch foremen, and inspectors charged with removing obstacles from train tracks.

FAA § 1 has long been construed as applying to workers who are either directly engaged in the movement of goods in interstate commerce or who perform "work so closely related to interstate commerce as to be in practical effect part of it." *Saxon*, 142 S.Ct. at 1789 ("We have said that it is 'too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it.'"). While ASI and its amicus, Airlines for America, contend that the "closely related to" test has been jettisoned, *Saxon* and many prior cases (as well as subsequent cases such as *Singh v. Uber Techs., Inc.*, 67 F.4th 550, 558 (3d Cir.

3

2023), *as amended* (May 4, 2023); *Fraga v. Premium Retail Servs., Inc*., 61 F.4th

228, 237-38 (1st Cir. 2023); *Immediato v. Postmates,* Inc., 54 F.4th 67, 74 (1st Cir.

2022)) hold otherwise. *See infra* Argument Section I.A.; *see also Carmona v.

Domino's Pizza, LLC*, 73 F.4th 1135, 1137 (9th Cir. 2023).

ASI's amicus also contends that at the time the FAA was enacted, the

workers who fueled railroad locomotives (the early 20th century counterpart to

aircraft fuelers) were *not* engaged in interstate commerce within the then-

understood limited scope of the Commerce Clause. That would be a powerful

argument if true, because the Supreme Court and this Court have long held that the

scope of the FAA § 1 exemption should be based upon its plain language *as

understood and applied in and before 1925* when the FAA was enacted. *See infra*

Argument Section II. But historically, ASI's amicus's argument is demonstrably

and completely wrong. The principal case cited by that ASI's amicus involved

railroad workers whose jobs were *two steps removed* from the work of locomotive

"firemen" (the workers whose jobs were most analogous to those of 21st century

aircraft fuelers like Lopez who loaded coal into locomotives' fireboxes to fuel the

trains). An unbroken line of federal court precedent, including several Supreme

Court cases, uniformly held that locomotive firemen in the early 20th century *were*

directly engaged in interstate commerce (and thus were within the scope of

4

Congress's authority to regulate under the Commerce Clause, for example, under the Federal Employers' Liability Act and Clayton Antitrust Act). The historical record therefore entirely supports the district court's ruling.

For these reasons, as set forth in greater detail below, Lopez respectfully requests that this Court affirm the district court's order denying ASI's motion to compel arbitration.

## ISSUES PRESENTED

Is the class of airline employees who directly fuel aircraft departing for international or interstate destinations "engaged in foreign or interstate commerce" within the meaning of Section 1 of the Federal Arbitration Act, 9 U.S.C. §1?

## STATEMENT OF THE CASE

Plaintiff Danny Lopez was employed by ASI as a field technician (aircraft "fueler") in the fueling department at Los Angeles International Airport from on or about December 2007 to on or about April 2021. 1-ER-31. As an aircraft fueler, Lopez's principal job responsibility was to pump fuel into the fuel tanks of passenger and cargo airplanes that were about to depart for foreign and domestic interstate travel. 1-ER-32.

On July 21, 2021, Lopez filed a complaint against ASI in Los Angeles County Superior Court, alleging a single claim for relief for civil penalties under the California Private Attorneys General Act of 2004, California Labor Code §§ 2698 *et seq*. ("PAGA"), premised on nine alleged violations of the California Labor Code: (1) Failure to Provide Meal Periods; (2) Failure to Provide Rest Periods; (3) Failure to Pay Overtime Wages; (4) Failure to Pay Minimum Wages; (5) Failure to Permit Inspection of Records; (6) Failure to Timely Pay Wages; (7) Failure to Pay All Wages Upon Termination; (8) Failure to Provide Accurate Itemized Wage Statements; and (9) Failure to Reimburse. 1-ER-48.

On September 2, 2021, ASI removed Lopez's action to federal court, citing 28 U.S.C. §§ 1332, 1441 and 1446, and the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, as the basis for removal. 1-ER-72. Lopez did not oppose removal.

**A. ASI Moved to Compel Arbitration of Lopez's PAGA Claim.**

On July 14, 2022, after the Supreme Court decided *Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906 (2022), ASI filed a motion to compel arbitration of the "individual" component of Lopez's PAGA claim and to dismiss the "non-individual" component. 1-ER-44, 51. In support of its motion, ASI submitted "MENZIES AVIATION ALTERNATIVE DISPUTE RESOLUTION POLICY,"

6

1-ER-61 ("ADR Policy"), a policy that prohibited class actions and FLSA

collective actions but did not prohibit PAGA representative actions. 1-ER-62.[1]

ASI also submitted a copy of a document entitled "AGREEMENT TO BE

BOUND BY ALTERNATIVE DISPUTE RESOLUTION." 1-ER-66 ("ADR

Agreement"). The ADR Agreement likewise included a class and collective action

waiver but made no mention of PAGA, representative actions, or private attorney

general claims. 1-ER-67.

ASI has apparently never located a copy of the ADR Agreement signed by

Lopez. 1-ER-66-67. Instead, it attached a single-page document that states "Danny

Lopez – 201121 – Aircraft Service International, Inc.," that included the word

"Accepted" in the "Status" column, and that listed the "Status Date" as

"06/28/2019 12:21 AM." *Id*. Lopez's signature, electronic or otherwise, does not

appear on the document.

---

[1] In pertinent part, the ADR Policy stated:

> The Menzies Aviation ADR Policy includes a waiver of the ability
> to participate in a class action or act as a collective action
> representative. By agreeing to be bound by the ADR Policy, you
> understand and agree this ADR Policy prohibits you from joining
> or participating in a class action or as a collective action
> representative, or otherwise consolidating a covered claim with the
> claims of others.

*Id.*

ASI contended that Lopez had signed the ADR Agreement and that, despite the absence of any language in the ADR Agreement referring to PAGA or to splitting PAGA claims between court and arbitration, the Agreement required the district court to compel arbitration of the "individual" component of Lopez's PAGA claim and to dismiss the rest of the claim for lack of standing. 1-ER-53-54.

**B. Lopez Opposed ASI's Motion to Compel on Multiple Grounds.**

On July 29, 2023, Lopez opposed ASI's motion to compel arbitration on three grounds. 1-ER-29. Most relevant to this appeal, Lopez contended that ASI's Arbitration Agreement was not enforceable against him under the FAA, 9 U.S.C. §2, because as an aircraft fueler, he was exempt from the FAA's coverage pursuant to FAA § 1, which exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 1-ER-31-32; *citing* 9 U.S.C. § 1; *see* 1-ER-31.

Lopez also contended that ASI had failed to demonstrate that he had bound himself to its ADR Agreement and that even if he were otherwise bound, ASI had misconstrued the Agreement's language and how it would apply. 1-ER-33-34.

In its reply, ASI argued that that Lopez's work as a fueler "is too far removed from the direct transportation of cargo to qualify for the exemption." 1-ER-11-12. ASI also presented a supplemental declaration from its Vice President

8

of Human Resources to support its assertion that Lopez had signed the ADR Agreement. 1-ER-16.

**C. The District Court Denied ASI's Motion to Compel Arbitration.**

On December 9, 2022, the district court (Gee, J.) issued its Order Denying Defendants' Motion to Compel Arbitration, holding that Lopez was exempt from the FAA's coverage because he belonged to a class of workers engaged in foreign or interstate commerce within the meaning of FAA § 1. 1-ER-6-7. The district court largely relied on the Supreme Court's decision in *Saxon*, which held that the Section 1 exception "applies to 'any class of workers directly involved in transporting goods across state or international borders,'" and that the exception is not limited to "only those airline transportation workers who actually 'ride aboard an airplane in interstate or foreign transit.'" 1-ER-6 (quoting *Saxon*, 142 S.Ct. at 1789).

The district court noted that ASI did not dispute that Lopez's job was to fuel aircraft involved in interstate commerce. *Id*. In concluding that aircraft fuelers were a class of workers exempt under FAA § 1, the court looked to the Supreme Court's analysis in *Saxon* as well as this Court's analysis of "last-leg" delivery drivers in *Rittmann*, 971 F.3d 904. *Id.* The court also distinguished *Holley-Gallegly v. TA Operating LLC*, No. ED CV 22-593-JGB (SHKx), 2022 WL 9959778 (C.D. Cal.

9

Sept. 16, 2022), *vacated and remanded*, No. 22-55950, 2023 WL 4674372 (9th Cir. July 21, 2023), a case involving truck mechanics that ASI had relied upon, because "even though [plaintiff truck mechanic's] employer was 'directly engaged in interstate commerce,' the mechanic himself was only 'perceptibly connected to the instrumentalities of commerce.'" 1-ER-6-7 (citing *id.* at *2-3).

The district court concluded based on the record before it that aircraft fuelers like Lopez have a sufficiently close nexus to interstate commerce that they are "directly involved in transportation itself" or "'so closely related to interstate transportation as to be practically a part of it.'" 1-ER-7 (quoting Saxon, 142 S.Ct. at 1789). In addition to *Saxon* and *Rittman*, the district court cited *Wirtz v. B. B. Saxon Co.*, 365 F.2d 457 (5th Cir. 1966), which held that employees who hauled fuel to airplanes that flew interstate were engaged in commerce for purposes of the Fair Labor Standards Act because their duties were "so closely related to [. . .] commerce as to be in practice and in legal contemplation a part of it." 1-ER-7 (quoting *Wirtz*, 365 F.2d at 461).

On January 9, 2023, ASI timely appealed the district court's denial of its motion to compel arbitration. 1-ER-164-71.

10

## SUMMARY OF ARGUMENT

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, which generally compels enforcement of written agreements to arbitrate, exempts from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1 ("Section 1"); *see New Prime Inc. v. Oliveira*, 139 S.Ct. 532, 537 (2019) ("While a court's authority under the [Federal] Arbitration Act to compel arbitration may be considerable, it isn't unconditional."). The Supreme Court has held that this statutory exemption for "contracts of employment of … other workers engaged in foreign or interstate commerce" exempts from the FAA's coverage the employment contracts of any class of workers engaged in interstate or foreign commerce within the meaning of the Commerce Clause as construed in 1925 when the FAA was enacted—*i.e.*, not as that Clause has been more broadly construed since the late 1930s. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) ("Section 1 exempts from the FAA only contracts of employment of transportation workers.").

In several cases following *Circuit City*, this Court has cited the Supreme Court's analysis, as well as the plain language of Section 1 and the considerable case law construing the scope and meaning of "interstate commerce" prior to 1925,

11

in holding that Congress intended the FAA's exemption for the classes of transportation workers "engaged in foreign or interstate commerce" to encompass those who are "actually engaged in the movement of goods in interstate commerce" as well as those whose job duties are "so closely related [to interstate and foreign commerce] as to be in practical effect part of it." *Rittmann*, 971 F.3d at 910-11 (first quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997), and then quoting *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593 (3d Cir. 2004)). The Ninth Circuit ratified that test most recently in *Carmona*, 73 F.4th at 1137, after concluding that the *Rittmann* test was fully consistent with the Supreme Court's intervening decision in *Saxon*, 142 S.Ct. at 1788-89.

In this case, the district court correctly held that plaintiff Lopez, a "field technician in the fueling department at Los Angeles International Airport [whose] job included physically adding fuel to passenger and cargo airplanes involved in both foreign and domestic interstate travel," ER 4-5, was in the class of workers who "fuel[ed] cargo planes that carry goods in interstate commerce," *id.* at 7, and that those airplane fuelers were exempt under FAA §1 as a class, because the act of physically adding fuel to passenger and cargo airplanes in interstate travel is "so closely related to interstate transportation as to be practically a part of it" as the Commerce Clause was understood in 1925. *Id.*

12

While defendant-appellant ASI insists throughout its brief that the district applied a novel test based on "physical and temporal proximity" (a term ASI uses nearly a dozen times), those words *never* appear in the district court's order, which hews closely to, and correctly applies, this Circuit's *Rittmann* test—which is the test that FAA § 1 requires.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant or deny a motion to compel arbitration *de novo*. *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1085 (9th Cir. 2020). However, the district court's "[u]nderlying factual findings are reviewed for clear error." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). "Review under the clearly erroneous standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'" *Balen v. Holland America Line Inc.*, 583 F.3d 647, 655 (9th Cir. 2009) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).

## ARGUMENT

I.    **The District Court Correctly Determined that Lopez Belonged to a Class of Workers "Engaged in Interstate Commerce" Under *Saxon*.**

In the 22 years since *Circuit City* limited the Section 1 exemption for interstate "transportation workers" as that term was understood in 1925, the

Supreme Court has twice addressed the scope of that exemption, in *New Prime*, 139 S.Ct. 532, and *Saxon*, 142 S.Ct. 1783. In *New Prime*, the Court held that the reference to "contracts of employment of … workers" in Section 1 included independent contractors as well as employees, because Congress had both categories of workers in mind when it enacted the FAA. 139 S.Ct. at 542-43. In *Saxon*, the Court held that because Section 1 refers to "any other *class* of workers," the first task for a court applying Section 1 is to determine to which class of workers the plaintiff belongs. In *Saxon*, the Court held that the plaintiff belonged to a class of airline "ramp supervisors," whose principal responsibility was to train and supervise the employees ("ramp agents") and who also helped the ramp agents load and unload cargo. The Court concluded that plaintiff Saxon, as a ramp supervisor who also loaded and unloaded cargo, belonged to a "class of workers engaged in foreign or interstate commerce" within the meaning of Section 1 of the FAA because the 1925 counterpart of airline cargo loaders—railroad cargo loaders—were included within the scope of the FAA § 1 exemption. *See* 142 S.Ct. at 1789.

The Court in *Saxon* emphasized that Section 1 did not require that a worker "ride aboard an airplane in interstate or foreign transit" or physically load or unload cargo to be exempt. *Id.* at 1791-92. Rather, it stated that the relevant

14

inquiries under FAA § 1 should include such considerations as: (1) whether the work of the relevant class of workers is "so closely related to interstate transportation as to be practically a part of it," *id.* at 1789 (quoting *Baltimore & Ohio Sw. R. Co. v. Burtch*, 263 U.S. 540, 544 (1924)), or "as a practical matter, part of the interstate transportation of goods," *id.*; (2) whether the class of workers "must at least play a direct and 'necessary role in the free flow of goods' across borders," or must otherwise "be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce," *id.* at 1790 (quoting *Circuit City*, 532 U.S. at 119-21); (3) whether the work "is intimately involved with the commerce (*e.g.*, transportation) of [the] cargo," *id.*; and (4) whether the workers perform "activities within the flow of interstate commerce," *id.* at 1792 (quoting *United States v. Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 276 (1975)).

The Court derived these factors from the plain language of Section 1, its statutory context, and the nearly identical language used in other statutory schemes around the time of the FAA's 1925 enactment. *Id.* at 1788-90.

*Saxon* began with an analysis of the statutory text as understood at the time Congress enacted the FAA in 1925:

> As always, we begin with the text. Again, to be "engaged" in something means to be "occupied," "employed," or "involved" in it. "Commerce,"

meanwhile, includes, among other things, "the transportation of ... goods, both by land and by sea." Black's Law Dictionary 220 (2d ed. 1910).

*Id*. at 1789. *Saxon*'s focus on the "ordinary, contemporary, common meaning of the text," *id.* at 1788 (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)), is consistent with the Supreme Court's prior interpretation of Section 1 in both *Circuit City* and in *New Prime*, in which the Court had emphasized that "it's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary ... meaning ... at the time Congress enacted the statute.'" 139 S.Ct. at 539 (citations omitted).

   *Saxon* construed the text of Section 1 by reference to the case law decided under other early 20th century statutes that similarly used the phrases "engaged in interstate commerce" or "engaged in commerce." 142 S.Ct. at 1789, 1792 (citing *Burch*, 263 U.S. at 544 (interpreting the Federal Employers' Liability Act: "loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it")); *see also id*. at 1792 (citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974) (under Clayton Act, intrastate sales of asphalt for later use were not "activities within the flow of interstate commerce"), and *United States v. American Building Maintenance Industries*, 422 U.S. 271, 276 (1975) (interpreting Clayton Act:

16

provision of localized janitorial services were not "within the flow of interstate commerce")).

Third, *Saxon* applied the *ejusdem generis* canon to inform the meaning of the exemption based on the preceding terms "seamen" and "railroad workers." *Id*. at 1789-90. As applied, those terms qualified the phrase "engaged in foreign or interstate commerce" to preclude it from being construed so broadly as to include *all* airline workers industry-wide, or so narrowly as to include only those transportation workers who physically traveled on an aircraft that flew interstate. *Id*. at 1791.

Fourth, *Saxon* analyzed the context of the phrase "engaged in foreign or interstate commerce" in reference to the definition of "maritime transactions" as used earlier in Section 1, noting that in 1925, maritime transactions included, among other things, "agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce." *Id*. at 1790.

## A. Lopez's Work is "So Closely Related to Interstate Transportation as to Be Practically a Part of It."

As the district court properly determined, aircraft fuelers like Lopez are "engaged in interstate commerce" within the meaning of FAA § 1 because their

17

work "fueling cargo planes that carry goods in interstate commerce" is "'so closely related to interstate transportation as to be practically a part of it.'" 1-ER-7 (quoting *Saxon*, 142 S.Ct. at 1789). The court did not, as ASI repeatedly insists, create a new "physical and temporal proximity" test—a term ASI uses throughout its Opening Brief, but which *nowhere appears in the district court's decision. See, e.g.*, AOB 29-30. Rather, the district court quoted *Saxon*'s exact language, and *Saxon* is the very case that ASI contends is controlling. 1-ER-7; *see* AOB 7, 16-18, 22-27.

The basis for *Saxon*'s "closely related" language was *Burtch*, 263 U.S. 540, a Federal Employers Liability Act ("FELA") case involving a worker injured while unloading a "heavy ensilage cutter" from a freight train. *See* 263 U.S. at 541-43 ("It is too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it"). The *Burtch* decision in turn rested upon *Shanks v. Delaware, Lackawanna & Western Railroad Co.*, 239 U.S. 556, 558-60 (1916), in which the Supreme Court held that a shop mechanic who repaired parts for locomotives was not engaged in work "so closely related" to interstate transportation "to be practically a part of it."

18

*Shanks* is particularly noteworthy for present purposes because, among the handful of cases the Supreme Court cited as involving work that *was* "so closely related" as to be part of interstate commerce were several cases involving railroad "firemen," the workers who in the late 19th and early 20th centuries fueled locomotive engines—*i.e.*, the direct historical counterpart to airplane fuelers like Lopez[2]:

> [W]e have held that the requisite employment in interstate commerce exists where …a fireman is walking ahead of and piloting through several switches a locomotive which is to be attached to an interstate train and to assist in moving the same up a grade (*Norfolk & W. R. Co. v. Earnest*, 229 U. S. 114, 57 L. ed. 1096, 33 Sup. Ct. Rep. 654, Ann. Cas. 1914C, 172); … where a fireman, having prepared his engine for a trip in interstate commerce, and being about to start on his run, is walking across adjacent tracks on an errand consistent with his duties (*North Carolina R. Co. v. Zachary*, 232 U. S. 248, 58 L. ed. 591, 34 Sup. Ct. Rep. 305, Ann. Cas. 1914C, 159).

239 U.S. at 558-59.

Airplane fuelers are within the same class of workers in the 21st century as railroad engine workers were in 1925 when the FAA was enacted.

ASI's amicus contends that *Saxon* "did not graft a 'closely related to' standard onto § 1 of the FAA." Amicus Br. 11. Amicus is correct that *Saxon* "did

---

[2] *Reading Co. v. Geary*, 47 F.2d 142, 144 (4th Cir. 1931) (a fireman's "main duty was to control the burning of the coal in the fire box"); *San Pedro, L.A. & S.L.R. Co. v. U.S.*, 213 F. 326, 327 (8th Cir. 1914) (the duties of "a fireman [were] to watch his engine and keep the fires alive"); *Great Northern Ry. Co. v. U.S.*, 211 F. 309, 312–13 (9th Cir. 1914) (discussing duties of an engine watchman to regulate steam.)

19

not graft" such a standard, but only because this "closely related to" standard has long been part of the early 20th century interstate-transportation jurisprudence, which is why decades of FAA case law has held that the FAA § 1 exemption covers "classes of workers who are actually engaged in the movement of interstate or foreign commerce *or in work so closely related* thereto as to be in practical effect part of it." *Cole*, 105 F.3d at 1471 (emphasis added) (quoting *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 598 (6th Cir. 1995)); *see also id*. (citing *Tenney Engineering, Inc. v. United Elec., Radio & Machine Workers of Am., Local 437,* 207 F.2d 450, 452 (3d. Cir. 1953) (applying "closely related to" standard to FAA analysis); *Dickstein v. duPont,* 443 F.2d 783, 785 (1st Cir. 1971) (same); and *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1069 (2d Cir. 1972) (citing to *Dickstein* and *Tenney*)).

The Supreme Court in *Saxon* not only left that longstanding construction undisturbed but quoted it in support of the Court's interpretation of Section 1. *See* 142 S.Ct. at 1789. In the short time since *Saxon* was decided, moreover, several courts have appropriately examined whether the activities of the class of workers at issue were "closely related" to interstate commerce and have cited *Saxon* in support of their inquiry. *See, e.g.*, *Singh*, 67 F.4th at 558 (reaffirming Third Circuit's "longstanding view of the residual clause as including those classes of

20

workers 'actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it.'"); *Fraga*, 61 F.4th at 237-38, n7 (*Saxon* "clarified" that Section 1 also applies to worker "who were not involved in transport themselves but were in positions 'so closely related' to interstate transportation 'as to be practically a part of it.'"); *Immediato*, 54 F.4th at 74 ("[Section 1] also applies to those who load and unload cargo in the course of interstate shipments as that work is "so closely related to interstate transportation as to be practically a part of it." (quoting *Saxon*, 142 S.Ct. at 1789)). The district court thus properly examined whether Lopez's work as a member of the class of aircraft fuelers was "so closely related" to interstate commerce as to be practically part of it, and correctly concluded that it was. 1-ER-7.[3]

---

[3] ASI contends the district court improperly relied on Lopez's "working environment" when resolving the FAA § 1 issue, but *Saxon*, too, depended on the fact that the class of ramp supervisors at issue worked at an airport. *Saxon*, 142 S.Ct. at 1790. While *Saxon* rejected the argument that the "industry" in which a plaintiff workers is the dispositive consideration (*i.e.*, not *all* airline industry workers are exempt), it did not hold that the plaintiff's workplace "environment" (where the work was performed and why) was irrelevant. What ultimately matters is the nature of the job duties performed by the class of workers at issue—here, aircraft fuelers at an international airport. *Id*. at 1788.

**B.      Lopez Played a Direct and Necessary Role in the Interstate Transportation of Goods.**

The district court also properly determined that aircraft fuelers were "engaged in interstate commerce" because they were "directly involved in the transportation itself, not only the maintenance of the means by which goods were transported." 1-ER-7. This approach is also fully consistent with *Saxon*, which asks whether the class of workers at issue plays "a direct and necessary role in the free flow of goods" across borders." 142 S.Ct. at 1790 (internal citation and quotation marks omitted).

It is difficult to imagine any activity more essential and directly involved in the transportation of goods or cargo than the pumping of fuel to enable the vehicle to travel. The act of fueling an aircraft is inseparable from the flow of interstate commerce. Accordingly, the workers who physically place fuel into aircraft about to embark on interstate or international travel are directly involved in interstate commerce. Because the work they perform plays a direct and necessary role in the free flow of goods across borders, they are actively engaged in the transportation of goods across borders through channels of interstate commerce.

22

C. *Saxon* Did Not Establish, and Lopez is Not Required to Satisfy, a "Hands-on" Requirement.

ASI repeatedly asserts that under *Saxon*, a class of workers must have "hands-on contact with 'goods' or 'cargo' *and* direct involvement in their interstate movement" to be "engaged in interstate commerce." AOB 24. While it happened to be true that the class of workers at issue in *Saxon* had such hands-on contact (as Lopez and other fuelers have hands-on contact with the fuel required to enable the aircraft to fly), *Saxon* expressly declined to decide "whether supervision of cargo loading alone would suffice to exempt a class of workers under § 1." 142 S.Ct. at 1789 (quotations omitted).

Adding a "hands on" requirement for Section 1 would make no sense because interstate transportation workers, such as drivers who shuttle passengers between train depots, and truck fuelers, are unquestionably engaged in interstate commerce. *United States v. Yellow Cab Co.*, 332 U.S. 218, 228-29 (1947), (transportation of interstate rail passengers between rail stations in Chicago to facilitate their travel is part of "the stream of interstate commerce" under Sherman Anti-Trust Act) *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752; *Overstreet v. N. Shore Corp.*, 318 U.S. 125, 130 (1943); *Usery v. Yates*, 565 F.2d 93, 96 (6th Cir. 1977) (employee who fueled trucks

23

traveling in interstate commerce "did in fact directly facilitate interstate commerce and fall within the overall coverage of the Act" under FLSA); see also, *Pecos & N.T.R. Co. v. Rosenbloom* 240 U.S. 439, 440 (1916) (ticket clerk who was killed while noting train numbers was "engaged in interstate commerce" under FELA).

Equally mistaken is ASI's assertion that an employee who works on an "instrumentality" of interstate commerce cannot qualify for the FAA § 1 exemption. *See* AOB 30. Employees whose jobs are essential to enabling an instrumentality to flow in interstate commerce are engaged in interstate commerce. Those classes of employees include railroad section hands responsible for maintaining railroad tracks, train brakemen, switchmen and switch foremen, inspectors charged with removing obstacles from train tracks, and workmen who erect bridges to permit passage of interstate trains. *San Pedro, L.A. & S.L.R. Co. v. Davide*, 210 F. 870, 871 (9th Cir. 1914) (work of section hand engaged in ballasting main track of the railroad "undoubtedly" in interstate commerce under FELA); *Glover v. Union Pac. R. Co.*, 21 F. Supp. 618 (D. Idaho 1937) (train brakeman was engaged in interstate commerce under FELA); *Texas & P. Ry. Co. v. Rigsby*, 241 U.S. 33, 36 (1916) (switchman at rail yard terminal engaged in interstate commerce under Federal Safety Appliance acts); *Erie R. Co. v. Purucker*, 244 U.S. 320, 321-22 (1917) (section man employed on track of interstate railroad

engaged in interstate commerce under FELA); *S. Ry. Co. v. Puckett*, 244 U.S. 571, 573 (1917) (train car inspector while engaged in clearing a wreck from the tracks was engaged in commerce under FELA); *Columbia & P. S. R. Co. v. Sauter,* 223 F. 604 (9th Cir. 1915) (workman erecting temporary bridge for train track over river engaged in interstate commerce under FELA); *Seaboard Air Line Ry. v. Moore*, 228 U.S. 433, 433-34 (1913) (switch engine foreman was engaged in interstate commerce under FELA).

ASI's new proposed "hands on goods" requirement would require overruling the considerable body of FAA case law holding that the Section 1 exemption applies not only to classes of workers actually engaged in the movement of interstate or foreign commerce, but also to those whose work is so closely related thereto as to be in practical effect part of it. *See Singh*, 67 F.4th at 558; *Fraga*, 61 F.4th at 237-38; *Immediato*, 54 F.4th at 74; *Waithaka*, 966 F.3d at 13. A hands-on requirement would also create a conflict with the Third Circuit's decision in *Palcko v. Airborne Express, Inc*., 372 F.3d 588, 593 (3d Cir. 2004), which held that supervisors who do not themselves handle cargo are covered by the Section 1 exemption (and which continues to be cited as good law after *Saxon, see, e.g., Gabay v. Roadway Movers, Inc.*, __ F. Supp. 3d __, 2023 WL 3144310 (S.D.N.Y. 2023)).

25

The Court in *Saxon* acknowledged that defining the scope of Section 1 would be more difficult when the duties carried out by the class of workers are "further removed from the channels of interstate commerce or the actual crossing of borders." 142 S.Ct. at 1789 n.2. But the Supreme Court did not call for a "hands-on" test to resolve those difficult cases, and this Court should decline ASI's invitation to create such a test given the many ways a class of workers could perform job activities directly related to interstate commerce without actually handling cargo.

## II. Binding Ninth Circuit Case Law Also Confirms that Airline Fuelers are "Engaged in Interstate Commerce" as the Term was Historically Understood.

The Ninth Circuit's leading case defining the scope of "workers engaged in foreign or interstate commerce" under FAA § 1 is *Rittmann*, 971 F.3rd 904. In that case, the panel determined that "last-leg" delivery drivers were transportation workers covered by the Section 1 exemption, even though that class of workers does not physically cross state lines. *Id.* at 909. Although *Rittmann* predates *Saxon*, this Court recently confirmed that *Rittmann* remains controlling precedent. *See Carmona*, 73 F.4th at 1137 ("Unless *Rittmann* is somehow "clearly irreconcilable"

26

with *Saxon*, we are required to continue to follow it. … We find no clear conflict between *Rittmann* and *Saxon*").

To determine whether a class of "last-leg" delivery drivers who do not personally cross state lines are "engaged in foreign or interstate commerce" for purposes of Section 1, this Court in *Rittmann* applied an analytical framework consistent with *Saxon*, focusing on (1) the plain meaning of the statutory language of Section 1 and (2) the actual work performed by the employees. *Id.* at 910-15. The panel began by considering plain meaning, just as the Supreme Court in *New Prime* the year before had determined the plain meaning of "contracts of employment of . . . workers engaged in . . . interstate commerce" by considering the "ordinary meaning . . . at the time Congress enacted the statute." *New Prime*, 139 S.Ct. at 538-39.

The panel in *Rittmann* looked to dictionary definitions at the time of the FAA's enactment in 1925 to determine Congress's intended meaning of the statutory terms "engaged" and "commerce":

> When Congress enacted the FAA, the word "engaged" meant "occupied or employed." *Engaged*, Webster's New International Dictionary (1st ed. 1909). "Commerce" was defined as:
>
> > Intercourse by way of trade and traffic between different people or states and the citizens or inhabitants thereof, including not only the purchase, sale, and exchange of commodities, but also the

27

> *instrumentalities and agencies by which it is promoted and the*
> *means and appliances by which it is carried on*, and the
> transportation of persons as well as of goods, both by land and by
> sea.

*Id*. at 910 (quoting *Commerce*, Black's Law Dictionary (2d ed. 1910)) (emphasis

added). The Ninth Circuit panel cited the same 1910 edition of Black's Law

Dictionary that the Supreme Court later cited in *Saxon*, although the panel in

*Rittmann* included the full definition, while the Supreme Court only cited the

portion of that definition that pertained to the precise question before it.

The complete definition of "commerce" quoted in *Rittmann* is instructive

because "commerce" in 1910 was understood to include not just "the transportation

of … goods, both by land and by sea" (which was the language the Supreme Court

cited in *Saxon*, 142 S.Ct. at 1789), but also "the instrumentalities and agencies by

which it is promoted and the means and appliances by which it is carried on."

*Rittmann*, 971 F.3d at 910 (quoting *Commerce*, Black's Law Dictionary (2d ed.

1910)). Based on this definition, the panel in *Rittmann* concluded that a

transportation worker need not personally cross state lines to be exempt under

Section 1. *Id*.

Further confirming the panel's construction of the statutory phrase "engaged

in interstate commerce" was the case law interpreting statutes with similar

language that Congress had enacted around the same time as the FAA, including

28

FELA, which applied to certain railroad employees who suffered on-the-job injuries. *Id*. at 910-11. The consistent contemporaneous construction of the identical "engaged in interstate commerce" statutory language in FELA included not only those railroad workers who were "actually engaged in the movement of interstate or foreign commerce" but also those who performed "work so closely related thereto [*i.e.*, related to interstate or foreign commerce] as to be in practical effect part of it." *Id*. (citing *Waithaka*, 966 F.3d at 13; *Cole*, 105 F.3d 1465; and *Palcko*, 372 F.3d 588). The decision in *Rittman* therefore anticipated the Supreme Court's similar analysis in *Saxon*. *See* 142 S.Ct. at 1789 ("[I]t is too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is *so closely related* to interstate transportation as to be practically a part of it") (emphasis added) (internal quotation marks and citation omitted).

For the reasons discussed above, workers who fuel airplanes that transport goods and passengers interstate are "in practical effect part of" interstate commerce, just as the workers who fueled railroad trains were engaged in interstate commerce in the early 1900s.

ASI and its amicus resist this conclusion, insisting that courts construing FAA § 1 should not rely on case law analyzing FELA and other statutes enacted

29

around the time of the FAA because Congress intended the interstate-commerce language in FELA and other statutes to be construed more broadly than the identical language under the FAA. AOB 28-29 n.3; Amicus Br. 18-22. Not only does that argument ignore the established canon that identical statutory language used in two (or more statutes) enacted contemporaneously should be presumed to have the same meaning, *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005), but it also ignores that this Court in *Rittmann* rejected that exact argument in this exact context. As the panel wrote in *Rittmann*, "FELA was concerned with the activities of employees, just as the FAA is. Indeed, in … the FELA precedents that we have discussed, the question before the Court was the same as it is here: whether certain transportation workers engaged in interstate commerce." *Rittmann*, 971 F.3d at 913 n.2 (quoting *Waithaka*, 966 F.3d at 21). In other words, this Court already considered and rejected ASI's argument that the meaning of "engaged in interstate commerce" meant one thing in FELA and quite another in the FAA.

 *Saxon* supports, rather than undercuts, this approach. *Saxon* relied on case law under FELA (enacted in 1908) and the Clayton Act (enacted in 1914) to support the Court's textual analysis of "engaged in interstate commerce." First, the Court cited *Burtch*, 263 U.S. 540, a FELA case. 142 S.Ct. at 1789. Then the Court cited case law interpreting the phrase "engaged in commerce" as used in the

Clayton Act. *Id.* at 1792. In so doing, the Court pointed to two examples of wholly intrastate commerce that were too far removed from an instrumentality of interstate commerce to be within the scope of Congress's Commerce Clause jurisdiction: the wholly intrastate sale of asphalt, some of which might be available for later use in building an interstate highway, *id.* (quoting *Gulf Oil*, 419 U.S. at 194 (brackets in original)), and the provision of localized janitorial services for the corporate offices of a firm engaged in interstate commerce, *id.* (citing *American Bldg.*, 422 U.S. at 283). The Supreme Court in *Saxon* observed that both of those activities were "only 'perceptibly connected to … instrumentalities' of interstate commerce" (intrastate sales of asphalt) or not "within the flow of interstate commerce" (intrastate sales of asphalt and provision of localized janitorial services for corporate offices). *Id.* (internal citations omitted).

This analysis demonstrates not only the appropriateness of relying on case law from analogous statutory contexts, but also that reasonably clear lines can be drawn, and regularly have been drawn, in determining whether particular work is sufficiently related to interstate commerce to be encompassed within the 1925 meaning of the phrase "engaged in commerce." As shown, courts in the early 1900s drew that line all the time. *See supra* Argument Section I.C.

31

The Third Circuit's decision in *Tenney Engineering*, 207 F.2d 450, further explains why application of the longstanding "closely related to" standard would not extend the FAA § 1 exemption beyond its intended reach. In *Tenney*, the court noted that Congress in the FAA chose to use statutory language that was almost identical to the language it had previously used—and that the courts had routinely applied, without apparent difficulty—in enacting FELA, which suggests that Congress "must have had in mind this current construction of the language which they used." *Id*. at 453; *see also Rittmann*, 971 F.3d at 913 (quoting *Tenney*). The Third Circuit further explained that as Congress later expanded its Commerce Clause powers, "it continued to use the phrase 'engaged in commerce' in the *narrower sense* while using other and more precise language to include activities merely affecting commerce. [Thus, for example,] Congress made the Fair Labor Standards Act applicable not only to employees 'engaged in commerce' but also to those engaged 'in the production of goods for commerce'." *Tenney*, 207 F.2d at 453 (quoting 29 U.S.C. § 206) (emphasis added).

The decisions in *Rittmann* and *Saxon* establish logical and workable outer boundaries to the scope of the Section 1 exemption. This Court's decision in *Rittmann*, for example, observed that when a worker's "job duties are 'only tangentially related to [the] movement of goods,'" that worker does not fall within

32

the scope of the Section 1 exemption. 971 F.3d at 911 (quoting *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 351-52 (8th Cir. 2005) (Section 1 exemption did not apply because customer service representative's activities were only tangentially related to the movement of goods)). This corresponds to the Supreme Court's instruction that work, "only 'perceptibly connected to ... instrumentalities' of interstate commerce was not enough" to fall under the Section 1 exclusion. *Saxon*, 142 S.Ct. at 1792. The references to work that is "only tangentially related" and "only perceptibly connected" to interstate commerce make clear that Congress did not intend the FAA § 1 exemption to apply when there is a materially significant qualitative and quantitative distance between the work performed by the employee and either the actual movement of goods or an instrumentality of interstate commerce.

*Rittman* also cited several cases that provided examples of activities that were too tangentially related to the movement of goods or too far distant from interstate transportation to be covered by the Section 1 exemption. For example, *Rittmann* cited the Eighth Circuit's decision in *Lenz* to explain that a customer service representative who had no direct responsibility for transporting goods and never handled any packages or directly supervised any drivers is not exempt under Section 1, even though he was employed by a transportation carrier, because the

33

job of providing customer service is too far removed from the actual commerce of goods. 971 F.3d at 911 (citing *Lenz* 431 F.3d at 351-52). *Rittmann* also cited an Eleventh Circuit case that found an account manager for a rent-to-own business who occasionally made out-of-state deliveries not within a class of workers in the transportation industry because the manager's employees' primary job responsibilities were unrelated to the interstate transportation of goods. 971 F.3d at 912 (citing *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289 (11th Cir. 2005)). Common to *Lenz* and *Hill* are activities that are primarily clerical in nature and largely, if not entirely, detached from both movement of the goods and cargo and the instrumentalities of interstate commerce. These cases illustrate that a workable and principled distinction exists between workers like aircraft fuelers, who may not cross state lines but whose work is indispensable to interstate commerce, and workers like account managers or customer service representatives who are outside the scope of the Section 1 exemption.

Additionally, as this Court noted in *Rittmann*, the Section 1 exemption *already applies* narrowly, as it applies only to contracts of transportation workers and not to all employment contracts. 971 F.3d at 914. "Nothing in *Circuit City* requires that we rely on the pro-arbitration purpose reflected in § 2 to even *further* limit the <u>already</u> narrow definition of the phrase 'engaged in

34

commerce.'" *Id*. (italics in original, underline added).[4] This position is consistent with the Supreme Court's decision in *New Prime*, 139 S.Ct. 532, where the Court had the opportunity to further limit the scope of the Section 1 exemption by excluding independent contractors on the ground that Congress intended "contracts of employment" to apply only to the contracts of "employees" and not to the contracts of "independent contractors." *Id.* at 542-43. The Court declined to impose that limitation on the statutory language. After examining the textual meaning of the term "contracts of employment" as understood in 1925, the Supreme Court held that Congress had intended to include *all* interstate-workers' contracts within the scope of the exemption. In *New Prime*, as here, a narrow application of the exemption did not trump a concise and accurate reading of the Section 1 language. *Rittman* is thus fully consistent with decades of precedent

---

[4] After *Circuit City* was decided, the Supreme Court in *Morgan v. Sundance* clarified that the pro-arbitration "federal policy is about treating arbitration contracts like all others, not about fostering arbitration." 142 S. Ct. 1708, 1713 (2022); *see also Armstrong v. Michaels Stores, Inc*., 59 F.4th 1011, 1014 (9th Cir. 2023) ("[T]here is no strong federal policy favoring enforcement of arbitration agreements." (citations omitted)). Put differently, the only pro-arbitration federal policy is "to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Id*. (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 404 n.12, (1967)). There is no special rule favoring arbitration. Instead, the federal policy is to treat arbitration agreements like other contracts.

relying on analogous congressional enactments to interpret the meaning of FAA Section 1.

III.  **The District Court's Conclusion that Lopez was Exempt under Section 1 is Supported by Nearly a Century of Case Law about Railroad "Firemen" and Fuelers.**

The district court's conclusion that the contracts of interstate airplane fuelers are exempt from the FAA's coverage is consistent with a long line of precedent dating back to the early part of the 20th century. In the early 1900s, the railroad industry equivalents of today's airplane fuelers were the railroad engine fuelers who worked as locomotive fireman or stokers (for coal engines) and engine watchmen (for steam engines). *See, e.g.*, *Reading Co. v. Geary*, 47 F.2d 142, 144 (4th Cir. 1931); *San Pedro, L.A. & S.L.R. Co. v. United States*, 213 F. 326, 327 (8th Cir. 1914); *Great Northern Ry. Co. v. United States*, 211 F. 309, 312-13 (9th Cir. 1914).

By the time Congress enacted the FAA, the Supreme Court had already ruled that locomotive firemen were engaged in interstate commerce because their jobs included preparing trains for travel. In *North Carolina Railroad Co. v. Zachary*, 232 U.S. 248 (1914), a FELA case, the Court held that fueling an instrumentality that flows in interstate commerce is considered "engagement in

36

interstate commerce" *even when the fueled-up engine had not yet been joined to an interstate-traveling train*:

> It is argued that because, so far as appears, deceased had not previously participated in any movement of interstate freight, and the through cars had not as yet been attached to his engine, his employment in interstate commerce was still *in futuro. It seems to us, however, that his acts in inspecting, oiling, firing, and preparing his engine for the trip to Selma were acts performed as a part of interstate commerce and the circumstance that the interstate freight cars had not as yet been coupled up is legally insignifican*t.

*Zachary*, 232 U.S. at 260 (emphasis added); *see also Louisville & N.R. Co. v. Parker*, 242 U.S. 13, 14 (1916) (whether fireman was engaged in interstate commerce depended on purpose of transferring empty car). The Supreme Court continued to hold that firemen were "engaged in interstate commerce" after the enactment of the FAA. *See Western & Atlantic R. R. v. Hughes* 278 U.S. 496, 497 (1929) (FELA case).

The circuit courts similarly treated train fuelers as "engaged in interstate commerce," both before and after the FAA's enactment. *See, e.g., Atlantic Coast Line R. Co. v. Williams*, 284 F. 262, 264 (5th Cir. 1922) (fireman who "was engaged in going to his work with the railroad company" was clearly … employ[ed] in interstate commerce"); *St. Joseph & G.I. Ry. Co. v. United States*, 232 F. 349, 352 (8th Cir. 1916) (that "the fireman on an interstate train is within the meaning of the [Hours of Service A]ct is not questioned."); *see also Anderson*

37

*v. Baltimore & O.R. Co.*, 96 F.2d 796, 797 (2d Cir. 1938) ("a fireman employed on an engine of the defendant railroad, met his death of July 25, 1935, while engaged in interstate commerce"); *Pa. R. Co. v. Hammond*, 7 F.2d 1010, 1010 (2d Cir. 1925) (parties stipulated that the plaintiff fireman "and the defendant were each engaged in interstate commerce at the time the plaintiff received the injuries"); *Phillips v. Pa. R. Co.*, 283 F. 381, 381 (7th Cir. 1922) (fireman was in "charge of the locomotive hauling the freight train in interstate commerce").

Notably, locomotive firemen were held to be "engaged in interstate commerce" even when their jobs did not require them to cross state lines (and sometimes even when their job duties did not require them to personally fuel the train). *See, e.g.*, *Lamphere v. Oregon R. & Nav. Co.*, 196 F. 336, 340 (9th Cir. 1912) (rejecting employer's argument that fireman was not actually engaged in interstate commerce because he was injured on his way to relieve co-workers and not fueling the train at the time of injury).

This case law makes good sense from a practical perspective. Aircraft fuelers, like the locomotive firemen before them, are indispensable to an instrumentality of interstate commerce. *Cf. Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335, 343 (D. Mass. 2019), *aff'd*, 966 F.3d 10 (1st Cir. 2020) ("Thus, while last-mile drivers themselves may not cross state lines, they are *indispensable*

38

*parts* of Amazon's distribution system. That system, of course, transports goods in interstate commerce. In the end, Plaintiff's employment […] is so closely related to interstate commerce as to be part of it.") (emphasis added). Obviously, if the fuelers did not perform their jobs, for example in the event of a labor stoppage, the impacts on interstate commerce would be direct and immediate. As the Supreme Court observed shortly before Congress enacted the FAA in 1925, "[i]t is evident from a review of title 3 of the Transportation Act of 1920 that Congress deems it of the highest public interest to prevent the interruption of interstate commerce by labor disputes and strikes." *Pa. R. Co. v. U.S. R.R. Lab. Bd.*, 261 U.S. 72, 43 (1923). This concern is echoed in the Court's analysis of FAA § 1 in *Circuit City*:

> When the FAA was adopted, moreover, grievance procedures existed for railroad employees under federal law, see Transportation Act of 1920, §§ 300–316, 41 Stat. 456, and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent, see Railway Labor Act of 1926. […] It is reasonable to assume that Congress excluded "seamen" and "railroad employees" from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers.

532 U.S. at 121. After *Circuit City*, courts considering the intended scope of Section 1 have continued to consider the impact of work stoppages as one way to measure a set of workers' impacts on interstate commerce. *See, e.g.*, *Lenz*, 431 F.3d at 351–52; *Veliz v. Cintas Corp.,* No. C 03-1180 SBA, 2004 WL 2452851, at *10 (N.D. Cal. Apr. 5, 2004), *modified on reconsideration*, No. 03-01180(SBA),

39

2005 WL 1048699 (N.D. Cal. May 4, 2005) (finding that "the nexus between the SSR's [sales service representatives'] job duties—customer service—is not so close to the SSR's use of the vehicle as to be inextricably intertwined. Nor would a strike by SSRs disrupt interstate commerce. While such a strike would certainly disrupt service to Cintas' customers, it would not otherwise interrupt the free flow of goods to third parties in the same way that a seamen's strike or railroad employee' strike would.").

The district court's decision is also supported by decades of cases involving fuel "haulers." In determining that airline fuelers like Lopez were within the scope of the Section 1 exemption, the district court cited a Fifth Circuit case decided under the FLSA, which held–using almost the exact language as *Saxon*–that "there can be no question" that employees who haul fuel to planes that transport goods in interstate commerce are "engaged in commerce." 1-ER-7 (quoting *Wirtz*, 365 F.2d at 461). Like *Saxon*, *Wirtz* identified activity intimately involved in interstate commerce or the instrumentalities thereof and found it to be "so closely related to [. . .] commerce as to be in practice and in legal contemplation a part of it." 1-ER-7 (quoting *Wirtz*, 461 F.2d at 462).

In *Wirtz*, the Fifth Circuit considered the extent to which various classes of workers who "transported fuel from bulk storage tanks [at a military base] to the

40

airplanes, where the fuel was put into the planes by Air Force personnel" were engaged in commerce, finding it "necessary to investigate the relationship between *the work of the individual employees* to the interstate-commerce function of the base." 365 F.2d at 459, 461 (emphasis added); *see also id.* at 461 ("There is, in our view, no more reason to hold that an entire military installation is engaged in commerce simply because a part of the land included within the base is used for that purpose than to hold that an entire town is engaged in commerce because a portion of the town's business is."); *see also Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959) ("To determine [whether employees are 'engaged in commerce'], we focus on the activities of the employees and not on the business of the employer." (Citations omitted)). In concluding that plaintiff fuel haulers engaged in interstate commerce, the Fifth Circuit relied on its prior opinion in *Mitchell v. Empire Gas Engineering Co.*, 256 F.2d 781 (5th Cir. 1958), which had focused on the critical role of army base fueling tanks in the re-fueling process, insofar as they "permit the rapid fueling of high speed planes designed for long range interstate and intercontinental flights" and "provide for the loading of fuel upon tanker planes for refueling of other planes in flight." *Id.* at 461 (citing *Mitchell*, 256 F.2d at 782-83).

41

The court in *Wirtz* concluded that employees who hauled fuel from storage tanks located at the military base to planes, operated tanks, repaired motor vehicles, provided on-base transportation, and maintained "runways, taxiways, and warm-up pads" that were "closely related to ... interstate flights" were engaged in commerce for purposes of the FLSA. *Wirtz*, 365 F.2d at 461-62. By contrast, the court found that the janitorial staff and employees who maintained the base water and sewage facilities, performed pest control throughout the base, operated the housing administration office, and kept time records were not performing activities "so closely related to the commerce of the [base] as to be a part of it." *Id*. at 462. This was true even as to custodians who cleaned "such buildings as the bank and post office, which [buildings] did house instrumentalities of interstate commerce ... because of the nature of their activities." *Id*.

*Wirtz* is particularly helpful because the facts of the case required the court to evaluate and compare different activities at the military base to determine which were engaged in interstate commerce. The line drawn between the activities, finding the fuel haulers to be engaged in interstate commerce, is fully consistent with the case law applicable to fuelers described above.

ASI's amicus insists that *Wirtz* is not applicable because it was decided under the FLSA and relied in part on FELA case law. Amicus Br. 22-23. But, as

42

discussed above, the Supreme Court in *Saxon* relied on cases interpreting analogous statutory language, *see* 142 S.Ct. at 1789, so it was entirely proper that the district court did so here. What's more, amicus's own embrace of case law under FELA to inform its construction of the FAA largely contradicts its argument that FELA cases are inapposite (*see infra* at 32-33 [re *Chicago & E.I.R. Co. v. Industrial Commission of Illinois*, 284 U.S. 296 (1932)]), and amicus effectively concedes that the FELA case law's interpretation of the phrase "engaged in interstate commerce" provides a useful source of guidance when interpreting the same phrase under the contemporaneously enacted FAA.

If hauling fuel from storage tanks on a military base to an aircraft that is actively in service is sufficiently related to interstate transportation as to be practically a part of it, then physically adding fuel to that aircraft must be even more intimately related to that commerce. An aircraft propelled by an engine that runs on fuel cannot move without that fuel. *See Canlas v. Aircraft Serv. Int'l, Inc.*, No. 16-CV-02355-JSW, 2017 WL 11715182 at *4 (N.D. Cal. Aug. 31, 2017) ("It is undisputed that fuelers, like Plaintiffs, provide a critical role in an air carrier's ability to provide transportation or cargo services. Without fuel, an airplane will not get off the ground. If a fueler is unavailable to load fuel into an airplane plane in the short amount of time expected by the air carriers, the flight will be delayed.

43

That delay, in turn, can result in a "ripple effect" of delays for other aircraft.") Because an aircraft in active service transporting goods or cargo cannot initiate or complete a flight if it has no fuel, fuelers necessarily play a direct and essential role in the free flow of goods transported by aircraft. The role of fuelers is inextricably bound to interstate transportation and indispensable to it, as reflected by the case law related to both firemen and haulers.

ASI's amicus also asserts that *Wirtz* "contradicts" Supreme Court precedent, citing *Chicago & E.I.R. Co. v. Industrial Commission of Illinois*, 284 U.S. 296 (1932), for the proposition that employees "who merely provide cross-border instrumentalities with products necessary for propulsion are *not* engaged in interstate commerce." Amicus Br. 5 (emphasis in original). Amicus correctly states the holding of the case but ignores the facts, especially as compared to fuelers like Lopez and the relevant comparator: locomotive firemen.

In *Chicago & E.I.R.*, a FELA case, the Supreme Court determined that the workers who made it possible for fuel to be provided to the workers who fueled the trains, *i.e.*, who were two steps removed from the fueling process, were not engaged in interstate commerce. The employee in *Chicago & E.I.R* "furnished power for hoisting coal into a chute, to be taken therefrom by, and for the use of, locomotive engines principally employed in the movement of interstate freight."

44

284 U.S. at 297. The employee did not himself fuel the train; he merely made it
possible for the fuel to be added to the storage chute, from which it could be
retrieved by the workers who actually conducted the fueling process. That
distinction is material and was the basis for the Court's reconciliation of three prior
cases involving different stages of the fueling process. *Chicago & E.I.R.* overruled
*Erie R. Co. v. Collins*, 253 U.S. 77 (1920), in which the Court had held that where
the actual work performed by the employee involved supplying a water tower with
water, not supplying the train itself with water, the employee was "engaged in
interstate commerce." *Id.* at 298 (citing and overruling *Collins*). *Chicago & E.I.R.*
also overruled *Erie R. Co. v. Szary*, 253 U.S. 86 (1920), where the Court had held
that an employee whose "duty . . . was to dry sand by the application of heat for the
use of locomotives" was engaged in interstate commerce. *Id.* (citing and overruling
*Szary*). The Supreme Court concluded that *Collins* and *Szary* were inconsistent
with its prior precedent in *Chicago, Burlington & Q.R. Co. v. Harrington*, 241 U.S.
177 (1916), which involved facts almost identical to those before it in *Chicago &
E.I.R.* In *Harrington*, the Court had held that an employee merely "putting . . . the
coal supply in a convenient place from which it could be taken as required for
use," *i.e.*, for later fueling by a different class of workers, was not "engaged in
interstate commerce." *See Chicago & E.I.R.*, 284 U.S. at 299. Taken together, this

45

body of FELA case law demonstrates that the test for "engaged in interstate commerce" under FELA is well-developed and sufficiently tailored to inform the proper construction of the FAA's Section 1 exemption. The distinction the Court drew in *Chicago & E.I.R.* is more fully explained in *Chicago & N.W. Ry. Co. v. Bolle*, 284 U.S. 74 (1931). In *Bolle*, the Court concluded: "There is evidence that respondent, at other times, had been engaged in supplying other engines with coal and water, firing live engines, and turning a turntable; but his employment at the time of the injury was confined to firing the stationary or locomotive engine for the sole purpose of producing steam. The character of the work which he did at other times, therefore, becomes immaterial." *Id*. at 77. *Bolle* makes clear, consistent with the analysis more recently applied in *Saxon* and *Rittmann*, that servicing an instrumentality such as a locomotive engine that is actively in service with coal is directly involved in the interstate transportation of goods or, at the very least, so closely related to it as to be practically a part of it.

Notably, the fuel haulers in *Wirtz* worked in an intermediate position between the *Chicago* employees who filled the chute (or coal shed) with coal, and the aircraft fuelers (like Lopez) who add fuel directly to the instrumentality. The fuel haulers took the fuel from the storage tank (the modern day equivalent of coal storage) and brought the fuel to the plane so it could be pumped into the

46

aircraft or loaded onboard by fuelers. The *Wirtz* fuel hauler is therefore more directly related to interstate commerce than the *Chicago* employee who simply made coal available. *Mitchell*, 256 F.2d at 782-83. Aircraft fuelers like Lopez are closer to the relevant instrumentality than both categories of workers since they directly add fuel to the aircraft.

ASI's amicus cites *Philadelphia, B. & W.R.R. Co. v. Smith*, 250 U.S. 101 (1919), in asserting that the cases applying FELA's "closely related to" standard construed the statute too broadly. ASI does not fully present the facts of *Smith*. The Supreme Court there stated the plaintiff belonged to a class of "bridge carpenters" who were "employed by defendant in the repair of the bridges and bridge abutments upon said line of railway." *Id*. at 102. Plaintiff "worked over the entire line" and was "moved from point to point as the repair work required in what was called a 'camp car,' furnished and moved by defendant, in which they ate, slept, and lived." *Id*. Although a member of bridge carpenter class, plaintiff's main duties were to "take care of this car, keep it clean, attend to the beds, and prepare and cook the meals for himself and the other members of the gang." *Id*.

As the Supreme Court later pointed out in *McLeod v. Threlkeld*, 319 U.S. 491 (1943), *Smith* is itself inconsistent with most of the Court's FELA case law,

47

including *Bolle*, *Chicago & E.I.R.,* and *New York, N.H. & H.R. Co. v. Bezue*, 284
U.S. 415 (1932) (discussed *infra*).

As the Court explained, these "three later cases limited the coverage of the
Federal Employers' Liability Act to the actual operation of transportation and acts
so closely related to transportation as to be themselves really a part of it." *Id*. at
496. *McLeod* demonstrates how Congress intended courts to determine whether
workers are engaged in interstate commerce:

> The test under this present act, to determine whether an employee is
> engaged in commerce, is not whether the employee's activities
> affect or indirectly relate to interstate commerce but whether they
> are actually in or so closely related to the movement of the
> commerce as to be a part of it. Employee activities outside of this
> movement, so far as they are covered by wage-hour regulation, are
> governed by the other phrase, 'production of goods for commerce.'

*Id*. Importantly, *McLeod* was a FLSA case, thus further demonstrating that the
appropriate textual analysis of the phrase "engaged in interstate commerce" in the
early part of the 20th century was consistent across the FELA, FLSA, Clayton
Antitrust Act, and the FAA.

ASI also relies on an unpublished district court case regarding truck
mechanics that this Court vacated and remanded. *Holley-Gallegly v. TA Operating
LLC*, No. EDCV22593JGBSHKX, 2022 WL 9959778 (C.D. Cal. Sept. 16, 2022),
*vacated and remanded*, No. 22-55950, 2023 WL 4674372 (9th Cir. July 21, 2023).

48

Even if *Holley-Gallegly* were in some way controlling, whether the truck mechanics in that case were engaged in interstate commerce has little to do with the issue before the Court concerning aircraft fuelers. *Compare Bezue*, 284 U.S. 415 (mechanic who worked on locomotive marked for "out of service repairs" not engaged in interstate commerce for purposes of FELA), *with New York Cent. R. Co. v. Marcone*, 281 U.S. 34 (1930) (railroad employee who filled grease cups and packed journal boxes on engines that were not withdrawn from service were "engaged in interstate commerce" for purposes of FELA). *See also Spokane, P. & S. Ry. Co. v. Martin*, 80 F.2d 322 (9th Cir. 1935) (citing *Marcone* and *Bezue* and adopting the "actual use and withdrawal from service doctrine" to determine whether railroad shop laborer was "engaged in interstate commerce" under FELA when performing work on components of locomotives that had been taken out of service).

    *Martin* is far more helpful to the analysis. First, the "withdrawal from service doctrine" that this Court relied upon in *Martin* distinguished between repairs needed mid-journey to enable an instrumentality to continue its travels, and repairs that required the instrumentality to be taken entirely out of service. *Id.* at 324. As this Court explained, where an "*instrumentality has been withdrawn from* or not yet dedicated to use in such *commerce*, although it may last have been

49

so used or be intended ultimately for such use, it has repeatedly been held that the work was not so closely related to interstate commerce as to be practically a part of it." *Id*. (italics modified). The aircraft at issue in the present case, of course, were very much in service and about to fly in interstate and foreign commerce.

## IV. The FAA's Legislative History Supports Exempting Interstate-Vehicle Fuelers under Section 1.

Section 1's legislative history, as discussed in the *Circuit City* majority opinion, also fully supports exempting aircraft fuelers under Section 1, because maritime and railroad fuelers were covered by other federal statutory schemes that provided for binding alternate dispute resolution (thus rendering it unnecessary to apply the ADR provisions of the new FAA to those workers), including the statutory precursor to the Railway Labor Act, which now encompasses airline employees no less than railroad employees. As the Supreme Court explained in justifying its decision to limit FAA §1 to classes of workers who were engaged in interstate commerce as that term was understood in 1925 and who were similar to the maritime and railroad workers to whom Section 1 expressly referred:

> We see no paradox in the congressional decision to exempt the workers over whom the commerce power was most apparent. To the contrary, it is a permissible inference that the employment contracts of the classes of workers in § 1 were excluded from the

50

FAA precisely because of Congress' undoubted authority to govern the employment relationships at issue by the enactment of statutes specific to them. *By the time the FAA was passed, Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers*, see Shipping Commissioners Act of 1872, 17 Stat. 262. *When the FAA was adopted, moreover, grievance procedures existed for railroad employees under federal law*, see Transportation Act of 1920, §§ 300–316, 41 Stat. 456, *and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent*, see Railway Labor Act of 1926, 44 Stat. 577, 46 U.S.C. § 651 (repealed). It is reasonable to assume that Congress excluded "seamen" and "railroad employees" from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers.

   As for the residual exclusion of "any other class of workers engaged in foreign or interstate commerce," Congress' demonstrated concern with transportation workers and their necessary role in the free flow of goods explains the linkage to the two specific, enumerated types of workers identified in the preceding portion of the sentence. *It would be rational for Congress to ensure that workers in general would be covered by the provisions of the FAA, while reserving for itself more specific legislation for those engaged in transportation.* See *Pryner v. Tractor Supply Co.*, 109 F.3d, at 358 (Posner, C. J.). *Indeed, such legislation was soon to follow, with the amendment of the Railway Labor Act in 1936 to include air carriers and their employees*, see 49 Stat. 1189, 45 U.S.C. §§ 181–188.

*Circuit City Stores,* 532 U.S. at 120-21 (emphasis added); *see also New Prime*, 139 S.Ct. at 537 ("[FAA] § 1 warns that 'nothing' in the Act 'shall apply' to 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.' Why this very particular qualification?

51

By the time it adopted the Arbitration Act in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers. And it seems Congress 'did not wish to unsettle' those arrangements in favor of whatever arbitration procedures the parties' private contracts might happen to contemplate.") (citing *Circuit City Stores*, 532 U.S. at 121)).

In other words, Supreme Court in *Circuit City* concluded that one of the reasons Congress may have felt comfortable exempting only some of the employees over which it could assert Commerce Clause jurisdiction in 1925 is because many of those workers were already covered, or would soon be covered, by other industry-specific statutory schemes with their own ADR provisions. While that may not be a complete explanation of Congress's purpose and intent, it fully supports application of the Section 1 exemption to airline employees like Lopez, given "the amendment of the Railway Labor Act in 1936 to include air carriers and their employees." *Id.*

## V.   The "Closely Related To" Standard is a Workable Standard for Identifying Employees Engaged in Interstate Commerce.

ASI's amicus contends that policy considerations cut against preserving the "closely related to standard" for application of the Section 1 exemption. Amicus

Br. 25-28. But this ignores the Supreme Court's affirmation of a "closely related to" standard in *Saxon* and the continued application of that standard by circuit courts relying on *Saxon* to interpret the FAA. See *Saxon*, 142 S.Ct. at 1789; *Fraga*, 61 F.4th at 237-38, n7; *Immediato*, 54 F.4th at 74; *Singh*, 67 F.4th at 558.

Contrary to the assertion that it will be problematic for courts to engage in line-drawing under a "closely related to" standard, that is what courts have done and continue to do. *Saxon* acknowledged that there will be times when the line drawn is clear, as it was with cargo loaders, and there will be times when "the answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." *Id*. at 1789 n.2 (comparing *Rittmann*, 971 F.3d at 915 (last-leg delivery drivers of interstate shipments covered by Section 1) to *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020) (local food service delivery drivers are not covered by Section 1)). *Saxon* recognized that the text of the statute allows for some applications that are obvious and some that are less so. By recognizing that different work duties will reflect varying degrees of involvement with interstate commerce, *Saxon* not only affirmed but embraced the courts' continued role as a line-drawer for application of Section 1.

53

ASI's amicus also suggests that the continued application of the closely related to standard would threaten a "gap in coverage" between the FAA and alternative dispute resolution ("ADR") schemes such as the Railway Labor Act. Amicus Br. at 28-29. Concern for a "gap" in ADR coverage has never been the guiding factor for determining FAA applicability. For instance, the classes of employees in *Rittmann* (last-leg delivery drivers for Amazon) and *Carmona* (drivers who distributed pizza ingredients to Domino franchisees) who are undoubtedly exempt from the FAA are not covered by any other federal ADR statute, let alone a federal ADR statute in effect in 1925. *Rittmann*, 971 F.3d at 915; *Carmona*, 73 F.4th at 1136.

Indeed, in *Rittman*, the Ninth Circuit concluded that the result of a "gap" between the FAA (which did not apply because Rittmann was exempt) and state law (which did not apply because of the terms of the specific contract) required affirmance of the district court's denial of arbitration. *Rittmann*, 971 F.3d at 921 ("Because there is no law that governs the arbitration provision, we agree with the district court that there is no valid arbitration agreement.").

## CONCLUSION

As a member of a class of transportation workers engaged in interstate commerce, plaintiff Danny Lopez is exempt from FAA coverage under 9 U.S.C. §

54

1. The district court correctly applied *Saxon* and *Rittmann* and decades of consistent case law in concluding that aircraft fuelers are "engaged in interstate commerce" when they add fuel to airplanes. The court did not, as ASI repeatedly insists, apply a new "physical and temporal proximity" test. Instead, it faithfully applied this Court's and the Supreme Court's precedents in concluding that the duties of aircraft fuelers are "so closely related to interstate transportation as to be practically a part of it" and are also "directly involved in the transportation itself." 1-ER-7.

For the reasons stated, the Court should affirm the district court's order denying ASI's motion to compel arbitration so this PAGA-only case may proceed in its entirety in federal district court.[5]

Dated: August 22, 2023              Respectfully submitted,

                                    */s/ Kiran Prasad*
                                    —————————————————
                                    Matthew J. Matern
                                    Matthew W. Gordon
                                    Max N. Sloves
                                    Kiran Prasad

                                    Attorneys for Plaintiff-Appellee
                                    DANNY LOPEZ

---

[5] If for any reason this Court should disagree, it should remand to enable the district court to consider Lopez's other grounds for opposing ASI's motion to compel, which the district court had no need to reach.

## STATEMENT OF RELATED CASES

Appellee is not aware of any related case pending in the Ninth Circuit.


Dated: August 22, 2023                  MATERN LAW GROUP, PC

                                */s/ Kiran Prasad*

                                Matthew J. Matern
                                Matthew W. Gordon
                                Max N. Sloves
                                Kiran Prasad

                                Attorneys for Plaintiff-Appellee
                                DANNY LOPEZ

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55015

I am the attorney or self-represented party.

**This brief contains** | 12,810 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(⦿) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | */s/ Kiran Prasad* | **Date** | 08/22/2023

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** 57 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: August 22, 2023              MATERN LAW GROUP, PC

*/s/ Kiran Prasad*
_____
Matthew J. Matern
Matthew W. Gordon
Max N. Sloves
Kiran Prasad

Attorneys for Plaintiff-Appellee
DANNY LOPEZ

58