

**ATTORNEYS AT LAW**

555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
213.972.4500 TEL
213.486.0065 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
213.972.4646
cward@foley.com EMAIL

CLIENT/MATTER NUMBER
043015-0316

March 13, 2024

**Via E-Filing**

Molly C. Dwyer
Clerk of the Court
United States Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

> Re:  Notice of Supplemental Authority
>      *Lopez v. Aircraft Service International, Inc.*, Case No. 23-55015

Dear Ms. Dwyer,

Pursuant to Fed. R. App. P. 28(j) and Circuit Rule 28-6, Appellants Aircraft Service International, Inc. and Menzies Aviation (USA), Inc. (hereinafter "Menzies") hereby notify the Court of additional authority that has issued since oral argument in this matter.

Yesterday, this Circuit published its opinion in *Ortiz v. Randstad Inhouse Servs., LLC*, -- F.4th – (9th Cir. 2024), No. 23-55147, analyzing the Federal Arbitration Act ("FAA") transportation worker exemption also at issue in this case. A copy of this opinion is enclosed with this letter.

The panel's analysis in *Ortiz* directly aligns with Menzies' arguments – that as a practical matter, for the FAA's transportation worker exemption to apply, the class of workers at issue <u>must have direct and physical (i.e. "hands-on") contact with the interstate goods themselves</u>. *Ortiz*'s language repeatedly emphasizes the dispositive importance of such direct contact with the goods – as opposed to mere involvement in their flow – in its application of the transportation worker exemption to a class of workers that barely transports, but nevertheless handles, interstate goods. *Id*. at 11-12, 15, 18-20 ("the relevant goods were still moving in interstate commerce when the employee interacted with them") (finding classes of workers to be "actively engaged" and "intimately involved with" transportation because the employees handled the goods) ("Though Ortiz moved goods only a short distance across the warehouse floor and onto and off of storage racks, he nevertheless moved them") ("The Supreme Court in *Saxon* did not improperly shift its focus away from Saxon's work by accounting for the inescapable fact that her job required her to handle goods that were currently in interstate commerce). Fuelers thus do not qualify as transportation workers because they never handle interstate goods; rather, their work is merely incidental to the flow of goods, meaning they do not satisfy the "inescapable fact" that the workers must themselves handle the goods. *Id*. at 19-20 ("Done properly, the analysis focuses not on the flow of goods themselves but on the employee's relationship with the flow of goods").

BOSTON          JACKSONVILLE     MILWAUKEE     SAN DIEGO        TAMPA
BRUSSELS        LOS ANGELES      NEW YORK      SAN FRANCISCO    TOKYO
CHICAGO         MADISON          ORLANDO       SILICON VALLEY   WASHINGTON, D.C.
DETROIT         MIAMI            SACRAMENTO    TALLAHASSEE

4877-3924-7277.1



**FOLEY & LARDNER LLP**

March 13, 2024
Page 2

      Menzies appreciates the Court's consideration of this supplemental authority.

             Regards,

             Christopher Ward

Enclosure

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ADAN ORTIZ, an individual and on behalf of all others similarly situated, | No.23-55147 |
| | D.C. No. |
| *Plaintiff-Appellee*, | 5:22-cv-01399- |
| v. | TJH-SHK |
| RANDSTAD INHOUSE SERVICES, LLC, a Delaware limited liability company; RANDSTAD NORTH AMERICA, INC., a Delaware corporation, | OPINION |
| *Defendants-Appellants*, | |
| and | |
| XPO LOGISTICS, INC., a Delaware corporation; XPO LOGISTICS, LLC, a Delaware corporation; XPO LOGISTICS SUPPLY CHAIN, INC.; DOES, 1 through 50, inclusive, | |
| *Defendants*. | |

2        ORTIZ V. RANDSTAD INHOUSE SERVICES, LLC

| | |
|---|---|
| ADAN ORTIZ, an individual and on behalf of all others similarly situated, | No. 23-55149 |
| *Plaintiff-Appellee*, | D.C. No. 5:22-cv-01399-TJH-SHK |
| v. | |
| XPO LOGISTICS, INC., a Delaware corporation; XPO LOGISTICS, LLC, a Delaware corporation; XPO LOGISTICS SUPPLY CHAIN, INC., | |
| *Defendants-Appellants*, | |
| and | |
| RANDSTAD INHOUSE SERVICES, LLC, a Delaware limited liability company; RANDSTAD NORTH AMERICA, INC., a Delaware corporation; DOES, 1 through 50, inclusive, | |
| *Defendants*. | |

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Jr., District Judge, Presiding

ORTIZ V. RANDSTAD INHOUSE SERVICES, LLC          3

Argued and Submitted December 4, 2023
Pasadena, California

Filed March 12, 2024

Before: Carlos T. Bea, Milan D. Smith, Jr., and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge VanDyke

---

## SUMMARY[*]

---

### Arbitration

In this consolidated interlocutory appeal, the panel affirmed in part the district court's order denying appellants' motion to compel arbitration, insofar as it concluded that the transportation worker exemption precluded the application of the Federal Arbitration Act ("FAA") to the parties' arbitration agreement.

Plaintiff sued his former employers, appellants Randstad Inhouse Services, LLC, and GXO Logistics Supply Chain, Inc., and appellants moved to compel arbitration pursuant to an arbitration agreement in the employment contract. During the pertinent period of employment, plaintiff worked at a California warehouse facility operated by GXO, which received Adidas watches, apparel, and shoes from mostly international locations. The district court

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

declined to compel arbitration. Appellants contend that the arbitration agreement is enforceable under the FAA.

The panel held that plaintiff belonged to a class of workers engaged in foreign or interstate commerce and was therefore exempted from the FAA. The panel considered the two-step analysis in *Saxon v. Southwest Airlines Co.*, 596 U.S. 450, 455-59 (2022). Applying *Saxon*'s first step, the panel considered plaintiff's job description and held that the district court properly concluded that plaintiff's job duties included exclusively warehouse work. Applying *Saxon*'s second step, the panel upheld the district court's conclusion that plaintiff belonged to a class of workers who played a direct and necessary role in the free flow of goods across borders and actively engaged in the transportation of such goods. Plaintiff's job description met all the benchmarks laid out in *Saxon* for plaintiff to qualify as an exempt transportation worker.

The panel rejected appellants' arguments to the contrary. An employee is not categorically excluded from the transportation worker exemption simply because he performs duties on a purely local basis. Though plaintiff moved goods only a short distance across the warehouse floor and onto storage racks, he nevertheless moved them, and with the direct purpose of facilitating their continued travel through an interstate supply chain. Finally, the panel held that an employee need not necessarily be employed by an employer in the transportation industry to qualify for the transportation worker exemption.

The panel addressed state law issues in a concurrently filed memorandum disposition.

## COUNSEL

Kiran A. Seldon (argued), Jessica C. Koenig, and Daniel C. Whang, Seyfarth Shaw LLP, Los Angeles, California; Timothy L. Johnson (argued), Jesse C. Ferrantella, and Cameron O. Flynn, Ogletree Deakins Nash Smoak & Stewart PC, San Diego, California; for Defendants-Appellants.

Thomas A. Segal (argued), Chaim S. Setareh, and Farrah Grant, Setareh Law Group, Beverly Hills, California, for Plaintiff-Appellee.

## OPINION

VANDYKE, Circuit Judge:

After several stints of temporary employment with Randstad Inhouse Services, LLC, and GXO Logistics Supply Chain, Inc., Adan Ortiz sued his former employers.[1] Pursuant to the arbitration agreement in Ortiz's employment contract, the employers moved to compel arbitration. Though the agreement covers Ortiz's claims, which generally relate to the conditions of his employment, Ortiz opposed arbitration on the grounds that the agreement cannot

---

[1] Ortiz sued several entities affiliated with Randstad Inhouse Services and several affiliated with GXO Logistics. At the time of his employment, GXO Logistics operated as XPO Logistics, and many of the affiliated entities retain the "XPO" label. This opinion refers to the Randstad defendants collectively as "Randstad" and the XPO/GXO defendants collectively as "GXO." Where the distinction between the two is immaterial, it refers to the defendants collectively as "the employers."

be enforced under either federal or state law. The district court agreed with Ortiz and declined to compel arbitration.

In this consolidated interlocutory appeal, the employers contend that the agreement is enforceable under the Federal Arbitration Act ("FAA") because Ortiz does not qualify for the FAA's transportation worker exemption. *See* 9 U.S.C. § 1. In the event the FAA does not apply, the employers argue that the agreement contemplates using state substantive law of arbitrability (here, California's) as an alternative means of enforcement. This opinion addresses only the applicability of the FAA.[2]

To determine whether the FAA applies, we must decide whether Ortiz belonged to a "class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, since such workers are exempted from the FAA. *Id.* Because we conclude that Ortiz is an exempt transportation worker, we affirm the district court's order insofar as it concluded that the FAA provides no basis to enforce the parties' arbitration agreement.

I.

Randstad is a staffing company. It hired Adan Ortiz three times: first from October 2011 to June 2013, again from August 2020 to February 2021, and finally from October to November 2021. During the second stint—the pertinent period of employment for present purposes—he worked at a California warehouse facility operated by GXO.

---

[2] We address the state law issues—including (1) whether this court has interlocutory jurisdiction to decide whether state law applies on an alternative basis and (2) if so, whether the parties' agreement provides for such alternative enforcement—in a concurrently filed memorandum disposition.

GXO operates warehouse and distribution facilities for Adidas. The warehouse where Ortiz worked receives Adidas watches, apparel, and shoes from mostly international locations, including Asia, South America, and Central America. Products remain at the warehouse for anywhere from several days to a few weeks, after which they are shipped to end-use consumers and retailers in a variety of states.

GXO's role in the international supply chain for Adidas products is small but important. It receives and stores Adidas products after they arrive from international suppliers, then processes and prepares them for further distribution across state lines. GXO does not move Adidas products to or from its warehouse. Nor, as explained below, are GXO employees with Ortiz's job description responsible for unloading the products once they arrive or loading them when they are scheduled for departure. Those tasks—like every other step in the Adidas supply chain—are handled by other employees or entities.

Ortiz was employed by GXO as a "PIT / Equipment Operator." He described his duties as follows: (1) "unloading and picking up the packages and transporting them to the warehouse racks to organize them," (2) "transport[ing] the packages to the picking section of the warehouse," (3) "assisting Pickers in obtaining packages so they could be shipped out," and (4) "assist[ing] the Outflow Department to prepare packages to leave the warehouse for their final destination."

It is not entirely clear what Ortiz meant by "unloading … the packages." GXO, for its part, asserted that PIT / Equipment Operators are not responsible for unloading products from shipping containers after they arrive at the

warehouse. "By the time the PIT / Equipment Operator handles Adidas products," a GXO employee familiar with the process explained, "they have already … been unloaded at the [warehouse] by someone other than the PIT / Equipment Operator." Finding the record ambiguous as to whether Ortiz loaded or unloaded packages from shipping containers or not, the district court assumed for the sake of its analysis that Ortiz did not do so. We do the same.

When Ortiz was hired to work for GXO, he signed an arbitration agreement with Randstad. GXO was expressly designated as an intended third-party beneficiary of the agreement as a Randstad client to whom Ortiz "provide[d] services on assignment." The agreement applied to all claims "relat[ing] to [Ortiz's] recruitment, hire, employment, client assignments and/or termination including, but not limited to, those concerning wages or compensation, consumer reports, benefits, contracts, discrimination, harassment, retaliation, leaves of absence or accommodation for a disability." Finally, the agreement's choice-of-law clause expressed a preference for enforcement under the FAA, noting that the agreement "shall be governed by the Federal Arbitration Act" and that it "may be enforced … otherwise pursuant to the FAA."

Notwithstanding the arbitration agreement, Ortiz filed a class action in California state court in March 2022. The complaint alleges various violations of California labor law, all of which are covered by the broad language of the arbitration agreement. Randstad timely removed the case to federal court and filed a motion to compel arbitration, which GXO joined.

The district court declined to compel arbitration. Relying on the Supreme Court's decision in *Southwest*

*Airlines Co. v. Saxon*, 596 U.S. 450 (2022), and this court's opinion in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020), it concluded that the FAA did not apply because Ortiz qualified as an exempt "transportation worker."[3] Randstad and GXO each filed separate interlocutory appeals, which were briefed and argued on a consolidated basis.

## II.

We have jurisdiction over the interlocutory appeal of an order denying a motion to compel arbitration pursuant to the FAA under 9 U.S.C. § 16(a)(1)(B). *Rittmann*, 971 F.3d at 909. Our review is de novo. *Id.*

## III.

The FAA, which was enacted in "hostility of American courts to the enforcement of arbitration agreements," "compels judicial enforcement of a wide range of written arbitration agreements." *Circuit City Stores v. Adams*, 532 U.S. 105, 111 (2001). Though the FAA's pro-arbitration mandate is broad, its reach is not universal. Section 1, for example, exempts the "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In keeping with the FAA's policy favoring arbitration, the Supreme Court has construed the residual clause in § 1 narrowly, applying it only to "contracts of employment of transportation workers." *Circuit City*, 532 U.S. at 119.

After *Circuit City*, questions remained about what an employee's job description must entail for that employee to

---

[3] It then concluded that the contract was ambiguous as to whether state law might apply in the alternative and construed that ambiguity against Randstad, the drafter. As noted above, we address that holding and related issues in a concurrently filed memorandum disposition.

qualify as an exempt "transportation worker." *See, e.g.*, *Rittmann*, 971 F.3d at 909 (considering whether an intrastate, last-mile delivery driver qualified as an exempt transportation worker). Especially considering the FAA's admonition that employees must be "engaged in foreign or interstate commerce" to qualify for the exemption, 9 U.S.C. § 1, employees like Ortiz, who do not transport products across great distances and interact with interstate commerce on a purely local basis, present a particularly difficult interpretive issue.

Fortunately, the Supreme Court recently confronted such a case in *Saxon v. Southwest Airlines Co*. Saxon worked for Southwest Airlines as a ramp supervisor. *Saxon*, 596 U.S. at 453. Like Ortiz, she did not cross state lines or transport goods across significant distances, and she played only a localized, supporting role in interstate commerce. *Id.* at 454, 462–63. To determine whether Saxon nevertheless qualified as an exempt transportation worker, the Court engaged in a two-step analysis. *Id.* at 455–59. First, the Court "defin[ed] the relevant 'class of workers' to which Saxon belong[ed]." *Id.* at 455. Then, it "determine[d] whether that class of workers is 'engaged in foreign or interstate commerce.'" *Id.*

At the first step, the Court considered Saxon's job description, which included "load[ing] and unload[ing] baggage, airmail, and commercial cargo on and off airplanes that travel across the country." *Id.* at 453; *see id.* at 456. In defining Saxon's class of workers, the Court considered the specific nature of her work, not her employer's status as a transportation company more generally. *Id.* at 456. Eschewing an "industrywide approach," it directed its "attention to 'the *performance* of work'" itself. *Id.* (quoting *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 541 (2019)). With that standard in mind, the Court concluded that Saxon

"belong[ed] to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis." *Id.*

At the second step, the Court disclaimed any strict requirement that a worker must personally transport goods interstate to qualify as a transportation worker. *See id.* at 457 (quoting *Balt. & Ohio Sw. R. Co. v. Burtch*, 263 U.S. 540, 544 (1924)) (considering it "too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it"). It then laid out a series of closely related standards detailing the required relationship between the class of workers and interstate commerce. First, "any such worker must at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 458 (quoting *Circuit City*, 532 U.S. at 121). Second, and "[p]ut another way," they must be "actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Id.* Finally, workers who are "intimately involved with the commerce (*e.g.*, transportation) of th[e] cargo" also qualify. *Id.*

Equally instructive are the categorical standards that *Saxon* declined to adopt. On one hand, the Court rejected Saxon's position that "virtually all employees of major transportation providers" are exempt. *Id.* at 461. On the other, it rejected Southwest's view that the provision applies only to "workers who physically move goods or people across foreign or international boundaries." *Id.* at 461–63.

Though the Court's different formulations of the test—direct and necessary, active engagement, and intimate involvement—all vary slightly, *Saxon*'s bottom line is that to qualify as a transportation worker, an employee's relationship to the movement of goods must be sufficiently

close enough to conclude that his work plays a tangible and meaningful role in their progress through the channels of interstate commerce. Ultimately, the Court held that *Saxon* met the interrelated standards it had just pronounced because "when she is 'doing the work of unloading' or loading cargo from a vehicle carrying goods in interstate transit," "there could be no doubt that interstate transportation is still in progress,' and that [Saxon] is engaged in that transportation.'" *Id.* at 458–59 (quoting *Erie R. Co. v. Shuart*, 250 U.S. 465, 468 (1919)) (cleaned up). If the same can be said of Ortiz, then under *Saxon*, he too qualifies as an exempt transportation worker.

*Saxon* "recognize[d] that the answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." *Id.* at 457 n.2. In recent years, this court has dealt with at least three such cases: *Rittmann*, 971 F.3d 904; *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854 (9th Cir. 2021); and *Carmona Mendoza v. Domino's Pizza, LLC*, 73 F.4th 1135 (2023), *petition for cert. filed* (U.S. Oct. 23, 2023) (No. 23-427). Unsurprisingly, the parties heavily engage with these cases in their briefs, and we consider each in turn.

In *Rittmann*, the court considered whether so-called "last mile" Amazon delivery drivers—contractors who deliver packages from a warehouse to end-use consumers on a predominantly intrastate basis—qualified for the exemption. 971 F.3d at 907. The panel concluded that they did, reasoning that workers may be "engaged in the movement of goods in interstate commerce, even if they do not cross state

lines," *id.* at 915, because they "complete the delivery of goods that Amazon ships across state lines," *id.* at 917.[4]

*Rittmann* was decided before *Saxon*, and *Saxon* cites *Rittmann* as an example of a case in which the "answer will not always be so plain" because the workers in *Rittmann* were "further removed from … the actual crossing of borders." 596 U.S. at 457 n.2.

*Carmona Mendoza*, which followed *Rittmann*, was also decided for the first time before *Saxon*, but the Supreme Court vacated and remanded the first opinion in *Carmona Mendoza* for reconsideration in light of *Saxon*. *See Carmona Mendoza*, 73 F.4th at 1136 (detailing the appellate history). On remand, the panel in *Carmona Mendoza* again followed *Rittmann*, holding that "*Saxon* is not inconsistent, let alone clearly irreconcilable, with *Rittmann*, which continues to control [the] analysis." *Id.* at 1138–39. Therefore, it reaffirmed its prior conclusion that delivery drivers who make last-mile deliveries of pizza ingredients from Domino's supply centers to its franchisees' retail stores were exempt transportation workers. *Id.*

As *Saxon* notes, the questions raised by cases like *Rittmann* and *Carmona Mendoza*, which involved purely intrastate shipment of goods to the terminus of a supply chain, have not yet been settled by the Supreme Court, and the courts of appeals have reached different conclusions. In

---

[4] Next came *Capriole*, a case involving Uber drivers, which approved of *Rittmann*'s analysis but distinguished its facts. 7 F.4th at 861 n.7. In *Capriole*, the court concluded that, unlike Amazon's last-mile delivery drivers, Uber drivers are not participants in "a single, unbroken stream of interstate commerce." *Id.* at 866–67 ("Uber stalwartly objects to any notion that interstate transportation is intrinsic to its service, and Plaintiffs have proffered no evidence undermining Uber's position.").

*Lopez v. Cintas Corp.*, for example, the Fifth Circuit considered whether local Cintas delivery drivers who pick up uniforms and deliver them to local customers fall under § 1's exemption. 47 F.4th 428, 430–32 (5th Cir. 2022) (citing *Rittmann*, 971 F.3d at 915–19). The Fifth Circuit said no, concluding that even though uniforms were sourced from out-of-state locations, "[o]nce the goods arrived at the Houston warehouse and were unloaded, anyone interacting with those goods was no longer engaged in interstate commerce." *Id.* at 433. And in *Hamrick v. Partsfleet, LLC*, the Eleventh Circuit reached the same conclusion as the Fifth, though it remanded the case to the district court to reconsider the issue using the correct standard. 1 F.4th 1337, 1351–52 (11th Cir. 2021) ("The district court concluded that the drivers fell within the transportation worker exemption because the goods at issue in this case originated in interstate commerce and were delivered, untransformed, to their destination. … This was error.") (cleaned up).

But unlike *Rittmann*, *Carmona Mendoza*, *Lopez*, or *Hamrick*, this case does not concern last-mile delivery drivers. It presents no thorny questions about when the interstate transport of goods ends and the purely intrastate transport of the same goods begins. Nor does it involve an employee who handles goods at or near the logistical end of an interstate or international supply chain. Rather, as the following review of the district court's two-part *Saxon* analysis demonstrates, this case tracks *Saxon* in every important respect.

Regarding *Saxon*'s first step, the district court concluded that Ortiz's job duties included exclusively warehouse work: transporting packages to and from storage racks, helping other employees in obtaining packages so they could be shipped, and assisting the Outflow Department to prepare

packages for their subsequent shipment. It rightly assumed that Ortiz was not involved in unloading shipping containers upon their arrival or loading them into trucks when they left the warehouse. It then properly defined Ortiz's class of workers by reference to his job description, as *Saxon* commands, and entirely without reference to GXO's line of business. The district court did not err at the first step.

And as to *Saxon*'s second step, the district court correctly concluded that Ortiz's class of workers "play[ed] a direct and 'necessary role in the free flow of goods' across borders" and "actively 'engaged in transportation'" of such goods. *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 121). Like Saxon, Ortiz handled Adidas products near the very heart of their supply chain. In each case, the relevant goods were still moving in interstate commerce when the employee interacted with them, and each employee played a necessary part in facilitating their continued movement.

For these reasons, Ortiz's job description meets all three benchmarks laid out in *Saxon*. Both Ortiz and Saxon fulfilled an admittedly small but nevertheless "direct and necessary" role in the interstate commerce of goods: Saxon ensured that baggage would reach its final destination by taking it on and off planes, while Ortiz ensured that goods would reach their final destination by processing and storing them while they awaited further interstate transport.

Both were also "actively engaged" and "intimately involved with" transportation: Saxon handled goods as they journeyed from terminal to plane, plane to plane, or plane to terminal, while Ortiz handled them as they went through the process of entering, temporarily occupying, and subsequently leaving the warehouse—a necessary step in their ongoing interstate journey to their final destination. *Id.*

16          ORTIZ V. RANDSTAD INHOUSE SERVICES, LLC

Both were actively engaged in the interstate commerce of goods. If *Saxon* is an exempt transportation worker, Ortiz is, too.

IV.

In response, the employers make multiple attempts to isolate Ortiz's job description from any discernable connection to the interstate transportation process. First, the employers emphasize Ortiz's purely intrastate role as a warehouse worker, noting that he did not move goods anywhere but within the facility and did not load or unload them as they were transported to and from the facility. In their view, because Ortiz performed his duties on an entirely intrastate basis, his role did not relate to interstate transportation in any meaningful sense.

The employers are incorrect. If *Saxon* stands for anything, it is that an employee is not categorically excluded from the transportation worker exemption simply because he performs his duties on a purely local basis. In *Saxon*, the plaintiff's job description was physically confined to Chicago's Midway International Airport. 596 U.S. at 454. But that did not preclude the Court from concluding that she was sufficiently connected to interstate commerce. *Id.* at 463. *Saxon* is clear on this issue: what matters is not the worker's geography, but his work's connection with—and relevance to—the interstate flow of goods. *Id.* at 458.

To further illustrate this point, consider the following historical example. In late 1860, the short-lived but nationally famous Pony Express hit full stride. Nevada, with its 47 waystations and 417 miles of trail, sat right in the heart of the route. At maximum, riders rode the trail for 100 miles per shift, meaning that on average, at least five riders were needed to cross Nevada alone. Even though some of these

riders would have crossed Nevada's territorial boundaries and others would not, all of them performed the same task (carrying the mail) using the same means (a horse) along the same route. There is no meaningful distinction between the interstate and intrastate riders, all of whom were "actively engaged in," "intimately involved with," and "play[ed] a direct and necessary role" in transporting interstate the very same letters from east to west.[5] *Saxon*, 596 U.S. at 458. The mere fact that some riders' routes were confined entirely within Nevada's borders does not divorce their role from the task of interstate transportation, and concluding otherwise requires willful blindness to the broader supply chain. So too here. Ortiz is perfectly capable of participating in the interstate supply chain for Adidas products even though he fulfills his role entirely within one state's borders.

Second—and returning to our era of planes, trains, and automobiles—the employers argue that Ortiz's role is insufficiently connected to interstate transportation because he did not transport the goods across any appreciable distance. But *Saxon* forecloses this argument, too. As a baggage handler, Saxon carried airport baggage over only a relatively small distance as she unloaded it from the plane and onto the tarmac (or vice versa). *Saxon*, 596 U.S. at 454. The basic fact that Saxon moved the bags across only a small distance does not change that she moved the baggage as part of its interstate travel. Movement over a short distance is movement nonetheless. And more importantly, the distance also does not affect the nature of the task or its inherent connection to interstate commerce. Without airport tarmac

---

[5] These historical facts were sourced from the National Pony Express Association and are available online at https://nationalponyexpress.org/historic-pony-express-trail/stations/.

staff to load and unload cargo, bags would not make it on or off planes, and the interstate commerce of baggage would immediately grind to a halt.

The same is true of employees like Ortiz who move Adidas products around GXO's warehouse. Though Ortiz moved goods only a short distance across the warehouse floor and onto and off of storage racks, he nevertheless moved them. And not only did he move them, he did so with the direct purpose of facilitating their continued travel through an interstate supply chain. Without employees like Ortiz, Adidas products that arrived at GXO's warehouse would not be properly processed, organized, stored, or prepared for the next leg of their interstate journey. Indeed, as GXO itself readily admits, although its employees do not actively transport Adidas products themselves, its warehouses act as intermediary "warehouse and distribution facilities" where products are "receive[d]," "store[d]," and "processe[d]" for further "distribution to businesses or end consumers" in other states. That process—and Ortiz's undisputed role in directly facilitating it—is a necessary step in an unbroken foreign and interstate supply chain for Adidas products.

Third, the employers correctly note that not every connection to commerce will suffice, no matter how tenuous the connection may be. *See id.* at 462 (quoting *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 198 (1974)) ("Being only 'perceptibly connected to … instrumentalities' of interstate commerce [i]s not enough."). It is true that Ortiz did not perform stereotypical transportation work, like driving a semi-truck or flying a freight plane. But this fact—true though it may be—does not end our analysis. As *Saxon* has made clear, the exemption is not limited to only those who themselves actually transport goods across state

boundaries. And in cases where courts have found an *insufficiently* close relationship, the employee's job description was much further removed from physically handling the goods than Ortiz was here.

For example, the employers cite a case involving a security guard who worked at a train station. *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465 (D.C. Cir. 1997). And in *Saxon*, Southwest cited a case involving janitorial services. *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271 (1975). *See* 596 U.S. at 462. But nothing about the work conducted by security guards or janitors is intrinsically connected to interstate commerce. As important as their jobs may be, neither physically handles goods or contributes *directly* to the flow of goods in interstate commerce. Even security guards and janitors whose employment with a transportation company creates a coincidental relationship to interstate commerce have nowhere near the connection to the actual transportation of goods that Ortiz had. Under *Saxon*, our focus is on "the *performance* of work," not the remote incidental relationships created by employment with a certain type of company. *Id.* at 456 (quoting *New Prime*, 139 S. Ct. at 541).

Fourth, the employers contend that this court may conclude that Ortiz is a transportation worker only if it improperly shifts its focus away from Ortiz's work and on to the goods themselves. This argument reveals the extent to which the employers underappreciate how observations about the broader supply chain should inform the court's view of the work performed by the relevant class of employees. The Supreme Court in *Saxon* did not improperly shift its focus away from Saxon's work by accounting for the inescapable fact that her job required her to handle goods that were currently in interstate commerce. Rather, the

Court could only understand the extent to which *Saxon* contributed to the interstate commerce of baggage after it understood that *Saxon*'s job, though performed on a purely local basis, involved handling bags as they traveled interstate. *Id.* at 463.

Nor, as the employers contend, does this mode of analysis necessarily transform *Saxon*'s standard into a "flow of commerce" test. Done properly, the analysis focuses not on the flow of goods themselves but on the employee's relationship with the flow of goods and the extent to which his role enables them to flow in interstate commerce. That inevitably requires an examination of the employee's role in context. Unsurprisingly, such context usually involves an understanding of how, when, and where goods move through the supply chain. But as demonstrated above, the flow of goods is hardly the only or even the primary consideration. The crux of the court's analysis remains the work accomplished.

Fifth and finally, the employers suggest that the nature of GXO's business—warehousing, not transportation—is further evidence that Ortiz is not a transportation worker. While the employers concede that *Saxon* rejects an "industrywide approach" when determining the class of workers to which a plaintiff belongs, *id.* at 456, they contend that rejection is limited to the first step, leaving parties free to rely on the employer's industry at the second step.

In support of this argument, the employers rely on two out-of-circuit decisions: *Hamrick*, 1 F.4th 1337, and *Bissonnette v. LePage Bakeries Park Street, LLC*, 49 F.4th 655 (2d Cir. 2022), *cert. granted* --- S. Ct. ----, 2023 WL 6319660 (Sept. 29, 2023). While *Hamrick* was decided before *Saxon* and *Bissonnette* was decided after it, both

relied on the same categorical rule: only workers employed in the transportation industry qualify for the transportation worker exemption. *Hamrick*, 1 F.4th at 1349 ("The transportation worker exemption applies if the employee is part of a class of workers: (1) employed in the transportation industry; and (2) that, in the main, actually engages in foreign or interstate commerce."); *Bissonnette*, 49 F.4th at 660 ("[T]he FAA exclusion is limited to workers involved in the transportation industry….").

*Bissonnette*, for example, involved truckers who delivered bread and other baked goods produced by Flower Foods, Inc., and its subsidiary bakeries. 49 F.4th at 657. Plaintiffs, who possessed distribution rights within the state of Connecticut, "pick[ed] up the baked goods from local Connecticut warehouses and deliver[ed] the goods to stores and restaurants within their assigned territories." *Id.* at 658. Nevertheless, the Second Circuit concluded that the transportation worker exemption did not apply to the plaintiffs "even though they drive trucks, because they are in the bakery industry, not a transportation industry." *Id.* at 657.

To the extent that the employers advance a similar categorical approach here, we find *Bissonnette* hard to square with *Saxon*'s reasoning. To begin, we are unconvinced that *Saxon*'s rejection of an industrywide approach applied only to the first step of the analysis. After all, the Court explicitly "reject[ed] Saxon's argument that § 1 exempts virtually all employees of major transportation providers," suggesting the Court's skepticism to an industrywide approach pervaded its entire analysis, not just its consideration of the relevant class of workers. 596 U.S. at 461.

And even assuming the employers are correct that, technically speaking, *Saxon* forbade such reasoning only at the first step, they ignore the reason why the employer's industry is irrelevant to properly defining the class of workers. Again, *Saxon*'s guiding principle is that courts should focus on the work employees perform, not the industry employers occupy. That principle applies as equally to *Saxon*'s second step as it does to its first.[6]

*Saxon*'s reasoning in this regard is consistent with the fundamental reality that within any given company, different classes of employees often have markedly different roles. That is true even if an employer is situated comfortably within one industry. For example, under *Saxon*, a janitor would not qualify as a transportation worker even if he was employed by Southwest Airlines because his role is not direct or necessary to, actively engaged in, or intimately involved with transportation. *See id.* at 460–62. On the other hand, a truck driver employed by a bakery or a temporary employee employed by a warehousing company might qualify despite the overarching nature of their employers' business because their particular job descriptions meet the standards laid out in *Saxon*. For these reasons, we conclude that an employee need not necessarily be employed

---

[6] As GXO correctly notes, *Saxon* did not decide whether a plaintiff's employment outside the transportation industry was fatal to his claim "because there the plaintiff worked for an airline." *Bissonnette*, 49 F.4th at 661. The Supreme Court has recently granted certiorari in *Bissonnette*, presumably to answer this exact question. The question presented is as follows: "To be exempt from the Federal Arbitration Act, must a class of workers that is actively engaged in interstate transportation also be employed by a company in the transportation industry?" Petition for Writ of Certiorari at i, *Bissonnette v. LePage Bakeries Park St., LLC*, No. 23-51 (July 17, 2023), 2023 WL 4680058.

by an employer in the transportation industry to qualify for the transportation worker exemption. [7]

* * *

At bottom, the employers cannot overcome the fact that § 1 "directs the interpreter's attention to the *performance* of work." *Id.* at 456 (internal quotations omitted). When, as *Saxon* commands, we consider the nature of the work performed by Ortiz's class of employees, we conclude that his role is "direct and necessary" to, "actively engaged in," and "intimately involved with" the interstate commerce of Adidas products. *See id.* at 458 (internal quotations omitted). None of the employers' contrary arguments compel a different conclusion. As such, the district court was correct to conclude that Ortiz qualifies for the FAA's transportation worker exemption, 9 U.S.C. § 1, and the parties' arbitration agreement cannot be enforced under the FAA.

V.

For these reasons, the district court's order denying appellants' motion to compel arbitration is **AFFIRMED IN PART**, insofar as it concluded that the transportation worker exemption precludes the application of the FAA to the parties' agreement.

---

[7] For the same reasons, appellants' motion to stay appellate proceedings (in 23-55147, ECF No. 34, and in 23-55149, ECF No. 32) pending the Supreme Court's decision in *Bissonnette* and its disposition of the petition for certiorari in *Carmona Mendoza* is **DENIED**.

## CERTIFICATE OF SERVICE

**9th Cir. Case Number: 23-55015**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system. Service on Case Participants Who Are Registered for Electronic Filing:

| | |
|---|---|
| Matthew Warren Gordon | ***Attorneys for Plaintiff-Appellee, Danny*** |
| Matthew J. Matern | ***Lopez*** |
| Max Neal Sloves | |
| Matern Law Group, PC | Tel: (310) 531-1900 |
| 1230 Rosecrans Ave., Suite 200 | E-mail: *mgordon@maternlawgroup.com* |
| Manhattan Beach, CA 90266 | E-mail: *mmatern@maternlawgroup.com* |
| | E-mail: *msloves@maternlawgroup.com* |

Description of Document(s) (required for all documents):

**Appellants' Notice of Supplemental Authority**.

**Signature** /s/ Christopher Ward_____          **Date:** March 13, 2024